216 F.2d 312
 E. CONSTANTIN, Jr., Appellant,
v.
M. G. MARTIN, M. J. Barris, Clara Lee Barris, Warren S. Blufston, Hanna K. Blufston, H. S. Blufston, Ida Blufston, Lena Burk, Willmar A. Chulock, Aaron W. Chulock, M. M. Goldman, Dorothy Goldman, S. F. Goldwyn, Mildred Guttman, Edith Marks, Arthur M. Holland, Ann Holland, Harry E. Holland, Max G. Holland, Lillian Holland, Goldie Jameson, Lester Jameson, Sam Karlov, Bernard Marks, Rebecca Marks, Howard A. Martin, Chester Rosenthal, Thelma Rosenthal, J. L. Rovin, Bertha Rovin, Nettie Schachtman, Michael Shepard, Alta W. Shepard, David Turnheim, Anna T. Kohn, Doyle Watson, Lorene Watson, Gilbert Schechtman, Hortense G. Shepard, Philip Shepard and Shell Oil Company, Appellees.
 No. 4871.
 United States Court of Appeals Tenth Circuit.
 October 14, 1954.
 
 C. J. Watts, Oklahoma City, Okl., and Robert D. Hudson, Tulsa, Okl. (Hudson, Hudson & Wheaton, Tulsa, Okl., Looney, Watts, Ross, Looney & Nichols and Ned Looney, Oklahoma City, Okl., on the briefs), for appellant.
 T. Murray Robinson, Oklahoma City, Okl. (S. F. Goldwyn, Tulsa, Okl., on the brief), for appellees.
 Before PHILLIPS, Chief Judge, PICKETT, Circuit Judge, and RITTER, District Judge.
 PHILLIPS, Chief Judge.
 
 
 1
 On February 23, 1949, M. G. Martin and Kenneth A. Ellison, being then the owners of oil and gas leases covering the SW ¼ and the W ½ of the SE ¼ of S. 18, T. 10 N., R. 20 W., entered into a contract with Constantin, by the terms of which Martin and Ellison agreed to assign to Constantin such oil and gas leases, in consideration of Constantin drilling a well on the tract of land covered by such leases. The contract provided that there should be reserved to the assignors "an undivided 5/14ths of the leasehold estate (being equivalent to 5/16ths of the 8/8ths gross production), and" that "all of the oil, gas and other minerals produced, saved, and sold from said premises and creditable to the interest reserved" should "be delivered by the Assignee to the Assignors free and clear of all costs of developing, equipping and operating said properties, so that said reserved interest" would "be in the nature of a perpetual overriding royalty; but" that "there" would "be deducted from the sale of production to said reserved interest all gross production taxes and other taxes assessed or assessable by proper governing authorities except as hereinafter provided." That the "Assignee" should "have the right to deliver Assignors' share of said products to the pipeline or lines to which it may connect the wells located upon said leasehold tracts." That "Assignors" should "be entitled to receive direct payment for their share of the products sold, and joint division orders or contracts of sale" would "be executed by each of the parties. Provided that upon reasonable notice (not less than thirty days) to Assignee, Assignors" should "have the right to receive in kind or to separately dispose of their share of such production and receive the proceeds therefor, if proper facilities are provided by Assignors in which to receive such production." Constantin drilled the well and thereafter, on June 14, 1949, Martin and Ellison and their respective wives executed and delivered to Constantin an assignment of such leases, containing the reservation of the overriding royalties in the exact terms provided in the contract. Thereafter, and by mesne assignments, portions of the royalty reserved to Martin and Ellison were transferred to the appellees, other than Martin. The appellees are hereinafter referred to as Martin and others.
 
 
 2
 On October 27, 1950, the Oklahoma Corporation Commission, by its order, made pursuant to Title 52, Ch. 3b of the Oklahoma Session Laws, 1945, 52 O.S. Supp.1949 § 286.1 et seq., created the Elk City Huxbar Sand Conglomerate Unit, composed of 81 tracts, which included the leases referred to above, designated as Tracts 1, 2 and 3.
 
 
 3
 The Commission, after due hearing, established a plan of unitization. The pertinent provisions of the plan read as follows:
 
 
 4
 "Definitions
 
 
 5
 "* * * (e) `Oil and Gas' shall not only refer to oil and gas as such in combination one with the other, but shall have reference to oil, gas, casinghead gas, casinghead gasoline, gas distillate, or other hydrocarbons, or any combination or combinations thereof, or any one thereof, which may be found in or produced from the Unit Area.
 
 
 6
 "(f) `Unit Production' shall mean and include all oil and gas produced from the Unit Area * * * regardless of the well or tract within the Unit Area from which the same is produced.
 
 
 7
 "(g) `Lessee' shall mean any owner, in whole or in part, of an oil and gas lease or any unleased mineral interest, who * * * has the right, except for this Plan of Unitization, to explore, develop, and operate a separately owned tract for oil and gas. An owner of an overriding royalty interest, * * * who does not have the right to develop and operate, shall not be regarded as a Lessee.
 
 
 8
 "(h) `Unit Operator' shall mean and refer to the lessee designated to carry on and conduct the unitized operations within the Unit Area * * *.
 
 
 9
 "(i) `Oil and Gas Rights' shall mean and include the right to explore, develop, and operate lands within the Unit Area for the production of oil and gas, to reduce the same to possession or to share in the production so obtained or the proceeds thereof.
 
 
 10
 * * * * *
 
 
 11
 "(k) `Unit Expense' shall include any and all cost, expense, or indebtedness incurred by the Unit or Unit Operator as authorized by this Plan of Unitization or the order of the Commission creating the Unit.
 
 
 12
 * * * * *
 
 
 13
 "V.
 
 
 14
 "General Powers of Unit
 
 
 15
 "The Unit is authorized and empowered on behalf and for the account of all the lessees within the Unit Area, without profit to the Unit, to supervise, manage, and conduct the further development and operation of the Unit Area for the production of oil and gas, * * *.
 
 
 16
 "VI.
 
 
 17
 "Effect of Unitization
 
 
 18
 "The adoption of this Plan of Unitization and the creation of the Unit as herein provided shall have the effect from and after the effective date of unitizing all further development and operations for the production of oil and gas from the Unit Area and of pooling and unitizing the production so obtained, all to the same extent as if the Unit Area had been included in a single lease and all rights thereunder owned by the lessees in undivided interests. Property rights, leases, contracts, and all other rights and obligations in respect to the oil and gas rights in and to the several separately owned tracts within the Unit Area, from and after the effective date hereof, shall be and are hereby amended and modified to the extent necessary to make the same conform to the provisions and requirements of this Plan of Unitization, but otherwise to remain in full force and effect.
 
 
 19
 * * * * *
 
 
 20
 "Nothing herein contained shall be construed to require or result in a transfer to or the vesting in the Unit of title to the separately owned tracts within the Unit Area or to the leases thereon, other than the right to use and operate the same to the extent set out in this Plan of Unitization; nor shall the Unit be regarded as owning any of the Unit Production. The Unit Production and the proceeds from the sale thereof shall be owned by the several persons to whom the same is allocated under this Plan of Unitization. All property, real or personal, which the Unit may in any way acquire, hold, or possess, * * * shall be the property of such lessees, as their interests may appear under this Plan of Unitization, subject, however, to the right of the Unit to the possession, management and use, or disposal of the same in the proper conduct of its affairs, * * *.
 
 
 21
 * * * * *
 
 
 22
 "VII.
 
 
 23
 "Allocation and Disposition of Unit Production
 
 
 24
 "All unit production as it is delivered by the Unit from the plant or plants or other facilities, except so much thereof as is used or consumed in developing, operating, cycling, repressuring, maintaining pressure, and in other operations carried on in accordance with this Plan of Unitization, or is unavoidably lost, shall be apportioned among and allocated to the several separately owned tracts within the Unit Area, in accordance with the Formula which is attached hereto as `Exhibit B.'
 
 
 25
 "The unit production allocated to each separately owned tract shall be divided among the several persons entitled to share in the production from such separately owned tract in the same manner, in the same proportions, and upon the same conditions that they would have participated and shared in the production from such separately owned tract had not the Unit been organized, and with the same legal force and effect. Each of such persons shall separately own, and shall separately take or sell its share of allocated unit production, and, in the latter event shall be entitled to receive payment directly from the purchaser.
 
 
 26
 * * * * * *
 
 
 27
 "If at any time the title or right of any person claiming the right to receive in kind all or any portion of the unit production allocated to a separately owned tract is in dispute or is disapproved by the Operating Committee, such person shall proceed to market the portion of the unit production title to which is in dispute or is disapproved and shall deliver the proceeds thereof to the Unit Operator until such time as the title or right thereto is established by final judgment of a court of competent jurisdiction, or otherwise to the satisfaction of the Operating Committee, whereupon, the proceeds so impounded and held by the Unit Operator shall be paid, without interest, to the person or persons rightfully entitled thereto. As an alternative the Operating Committee may require acceptable security to guarantee proper accounting to the rightful owner or owners in the event the title or right of such person shall fail, in whole or in part.
 
 
 28
 * * * * * *
 
 
 29
 "7. This Commission retains continuing jurisdiction over said Unit for the purpose of amending, modifying, and interpreting the terms and provisions of this order and the Plan of Unitization of said Unit."
 
 
 30
 The Plan created an operating committee and empowered it to purchase, construct, locate, sell or dispose of any processing plant, compression plant, gasoline plant or other facilities serving the Unit Area, or to contract with the owners of an individually owned plant or plants, or facilities to render the services in whole or in part.
 
 
 31
 It provided for the allocation "to the several separately owned tracts in the Unit Area," of Unit expenses for a Unitization Plan of operation, to include cycling, pressure maintenance, and repressure operations for the production of liquid hydrocarbons and gas under the most efficient conditions possible.
 
 
 32
 Under the formulation, as established, Tracts 1, 2 and 3 and the other tracts embraced in the Unit were assigned a percentage participation factor of the total Unit production, in lieu of the actual production from each tract.
 
 
 33
 Martin and others agreed with Constantin that they would waive their right to take their proportionate part of the production in kind.
 
 
 34
 The lessees participating in the Unit built a $6,000,000 plant for the extraction of pentanes, butanes and propanes. Since January 1, 1951, the Shell Oil Company has purchased all of the Unit production allowable to Tracts 1, 2 and 3. From the date of the completion of the plant until May 1, 1951, Shell paid to Martin and others their proportionate share of the products manufactured in the plant.
 
 
 35
 A controversy arose between Constantin and Martin and others as to whether Constantin was entitled to receive from Shell the cost of processing Martin's and others' share of the production, out of their share of such production.
 
 
 36
 On June 4, 1951, Constantin requested Shell to withhold payment of all proceeds applicable to overriding royalties that were derived from the plant. Martin and others then brought this action against Shell to recover their portion of the production without deducting any cost. Constantin intervened in the proceedings.
 
 
 37
 From a judgment adverse to the contentions of Constantin, he has appealed.
 
 
 38
 Section 4 of Title 52, Ch. 3, Session Laws of Oklahoma, 1947, 52 O.S.Supp. 1949, § 86.4, provides:
 
 
 39
 "Rules and Regulations. The Commission is hereby empowered after notice of hearing to make all such orders, rules and regulations applicable to each common source of supply as it may find to be necessary or proper and to make general orders, rules and regulations applicable alike to all common sources of supply in the State. It shall not be necessary to publish such order, rule or regulation, after its adoption or promulgation by the Commission, before it shall go into effect, nor shall it be necessary to publish any such order, rule or regulation in each subsequent annual report of the Commission. * * *" (Italics ours.)
 
 
 40
 52 Okl.St.Ann. § 286.10, Okl.S.Laws 1945, p. 167, § 10, in part reads:
 
 
 41
 "The amount of the unit production allocated to each separately-owned tract within the unit, * * except as may be otherwise authorized in this Act, or in the plan of unitization approved by the Commission, shall be distributed among or the proceeds thereof paid to the several persons entitled to share in the production for such separately-owned tract in the same manner, in the same proportions, and upon the same conditions that they would have participated and shared in the production or proceeds thereof from such separately-owned tract had not said unit been organized, and with the same legal force and effect. * * *"
 
 
 42
 52 Okl.St.Ann. § 286.11 Okl.S.Laws 1945, p. 168, § 11, in part provides:
 
 
 43
 "In any proceeding hereunder in which an order is entered creating a unit, the Commission shall retain jurisdiction thereof and of all parties in interest for the purpose of amending the plan of unitization from time to time whenever by reason of changed conditions or otherwise for good cause shown it is made to appear that such amendment is necessary or proper. * * *"
 
 
 44
 52 Okl.St.Ann. § 287.2, Okl.S.Laws 1951, p. 137, § 2, provides:
 
 
 45
 "Subject to the limitations of this Act the Corporation Commission of the State of Oklahoma, hereinafter referred to as the `Commission,' is hereby vested with jurisdiction, power and authority, and it shall be its duty to make and enforce such orders and do such things as may be necessary or proper to carry out and effectuate the purposes of this Act."
 
 
 46
 At the threshold of the case, we are confronted with the question of whether there were available adminstrative remedies, which Martin and others should have exhausted before seeking judicial relief.
 
 
 47
 It is well settled that a litigant must exhaust his available administrative remedies before seeking judicial relief.[1]
 
 
 48
 The question presented involves, primarily, a construction of the overriding royalty provisions of the leases and the provisions of the Unitization Plan with respect to allocation and disposition of Unit products, quoted above.
 
 
 49
 The statute authorizes the Commission to make orders, rules and regulations applicable to each common source of supply, as it may find to be necessary or proper. The plan expressly reserved to the Commission continuing jurisdiction over the Unit for the purpose of determining, modifying and interpreting the terms and provisions of the Plan of Unitization.
 
 
 50
 If the terms of the overriding royalty provision are controlling, there can be no doubt that Martin and others were entitled only to their royalty interests in kind and if the production in kind, which belonged to Martin and others, was processed at the cost and expense of Constantin, he would be entitled to reimbursement for the costs and expense of processing the share of Martin and others.
 
 
 51
 The provisions of the Plan, with respect to allocation and disposition of the Unit production, are not free from ambiguity. The first paragraph would seem to entitle Martin and others to their share of the production from the plant or plants or other facilities, free of processing expenses. The second paragraph would indicate that they would be liable to Constantin for their share of the costs and expense of processing.
 
 
 52
 We are of the opinion that the Plan requires interpretation and possible clarification by the Commission, under its retained jurisdiction.
 
 
 53
 It seems clear to us that Martin and others should have resorted first to the Commission for an administrative remedy, namely, an interpretation, and, if necessary, a clarification of the provisions relating to allocation and disposition of Unit production. Not having exhausted their administrative remedies, Martin and others are not entitled to judicial relief.
 
 
 54
 Accordingly, the cause is remanded, with instructions to vacate the judgment and dismiss the complaint without prejudice.
 
 
 
 Notes:
 
 
 [1]
 Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638; May v. Maurer, 10 Cir., 185 F.2d 475