**Matter of the Application of M. G. MARTIN et al., for an Order Clarifying Orders Numbered 24158, 24402, 26021, 27218 and 28533 and Directing the Action to be Taken by Applicants, and Shell Oil Company and by E. Constantin, Jr.**

Nos. 36888, 36930.

Supreme Court of Oklahoma.

April 24, 1956.

Dissenting Opinion Oct. 15, 1957.

Rehearing Denied Oct. 15, 1957.

Application for Leave to File Second Petition for Rehearing Denied Feb. 18, 1958.

**660**

Hudson, Hudson & Wheaton, Tulsa, and Looney, Watts, Ross, Looney & Nichols, Oklahoma City, for plaintiff in error.

S. F. Goldwyn, Tulsa, Robinson, Shipp, Robertson & Barnes, Floyd Green, and Mac Q. Williamson, Atty. Gen., Oklahoma City, for defendant in error.

BLACKBIRD, Justice.

Early in 1949 a certain half-section of land now included in the Elk City Field of Western Oklahoma, was unexplored and undeveloped for oil and gas mining purposes, but M. G. Martin and others owned an oil and gas lease thereon. Instead of performing the exploration and development contemplated in said lease, said lessees

decided to assign it to E. Constantin, Jr., and reserve unto themselves what is termed an overriding royalty in the oil and gas and other minerals that said land might produce. Accordingly, they entered into a contract with Constantin whereby they agreed to execute such assignments to him, subject to the following reservation:

"First parties shall exempt from such assignments and reserve unto themselves, their heirs, successors, and assigns, an undivided 5/14ths of the leasehold estate (being equivalent to 5/16ths of the 8/8ths gross production), and all of the oil, gas and other minerals produced, saved, and sold from said premises and creditable to the interest reserved shall be delivered by the Assignee to the Assignors free and clear of all costs of developing, equipping and operating said properties, so that said reserved interest shall be in the nature of a perpetual overriding royalty; but there shall be deducted from the sale of production to said reserved interest all gross production taxes and other taxes assessed or assessable by proper governing authorities except as hereafter provided.

"Assignee shall have the right to deliver Assignor's share of said products to the pipeline or lines to which it may connect the wells located upon said leasehold tracts. Assignors shall be entitled to receive direct payment for their share of the products sold, and joint division orders or contracts of sale shall be executed by each of the parties. Provided that upon reasonable notice (not less than thirty days) to Assignee, Assignor shall have the right to receive in kind or to separately dispose of their share of such production and receive the proceeds therefor, if proper facilities are provided by Assignors in which to receive such production."

Said contract was filed of record, and in June, 1949, the assignment contemplated therein was executed, delivered and recorded. The above-described reservation was incorporated in the assignment by reference.

Thereafter, oil and gas having been discovered in the area, and the State Corporation Commission having, by a previous well-spacing order, included 120 acres of the half section of land above referred to, in what was designated as the Hoxbar Sand-Conglomerate Common Source of Supply of the Elk City Field, on October 27, 1950, entered in its Cause CD No. 2846, its original Order No. 23249, unitizing the majority of the area and creating of it a unit designated and known as the "Elk City Hoxbar-Sand-Conglomerate Unit", in accord with and subject to the terms, provisions and conditions of a Plan of Unitization presented in said cause, and amended, and modified by said order. Other acreages have been included within said unit by subsequent orders of the Commission numbered 24158, 24402, 26021, 27218 and 28533, respectively, amending the original order and Plan of Unitization. The particular 120 acres of land above mentioned now has 3 wells thereon that produce "wet" or casinghead gas in conjunction with their crude oil production.

Since the Unit began effective existence, an operating committee, in accord with provisions of the Plan of Unitization, has been in charge of operating the leases and wells within the unit, and, in addition, has constructed, and is operating, a plant situated on the unitized area, whereto all raw or wet gas, after being separated from the crude oil produced by the Unit wells, is piped in "one stream" to be "processed." By the so-called processing performed in this plant, gasoline and other hydrocarbons later sold as pentanes, butanes and propanes to Shell Oil Company, are extracted from said gas, and the residue, or dry, gas returned to the Field's reservoir or common source of supply, to repressure its producing sand as an aid to the ultimate maximum recovery of oil therefrom.

The present controversy as to how the owners of overriding royalty in land includ-

ed within the Unit shall be paid for their share of the gas production from said land had its inception in, and would never have arisen, except for his system of processing, installed and paid for at a cost of several millions of dollars to the lessees of the unit, whereunder none of the gas from the Unit wells is sold in its natural, "raw" or "wet" state; and, the only sales that occur, are of the above-mentioned derivatives or by-products. Concededly, those processed commodities bring a much higher price than could be derived from the sale of the unit's gas production in its natural or "raw" state at the wellhead or elsewhere, before being put through the expensive processing above referred to. Nevertheless, all royalty owners were paid the same pro rata share of the proceeds of these by-products, that they were paid of the Units wells' crude oil production, for the first five months after the processing plant was constructed and began operating late in 1950, without any deduction whatsoever for the cost of constructing, maintaining and operating the processing plant. Due to the fact that during the formulation and/or negotiation stages of the plan of unitization, the lessees of the unit agreed that the owners of the landowners' one-eighth interest in the mineral rights in the land within the unit (referred to as "basic royalty owners") should receive their pro rata share of these proceeds without deduction of such processing costs, no controversy has existed with reference to their continued right to thus participate in the proceeds of the hydrocarbons. However, for some time Constantin has taken the position that the over-riding royalty owners, such as his assignors, Martin, et al., being the beneficiaries of no such agreement, are not entitled to participate in such proceeds without some deduction for said processing costs. Accordingly, on June 4, 1951, he prevailed upon the purchaser, Shell Oil Company, to withhold further payments of such proceeds to said overriding royalty owners.

Thereafter, the latter, including Martin, sued Shell Oil Company in the Federal District Court to recover their alleged share of said proceeds, and Constantin intervened. When that case was appealed to the Circuit Court from a judgment in favor of Constantin v. Martin, 10 Cir., 216 F.2d 312, that court, upon deciding that the appeal involved a construction of over-riding royalty reservations or provisions such as hereinbefore quoted and of provisions of the Unitization Plan, and that by paragraph 7 of its Order No. 27218, the Corporation Commission had retained continuing jurisdiction to interpret the provisions of said Plan, ordered the action dismissed without prejudice, on the ground that the royalty owners had not exhausted their administrative remedy in said Commission.

Thereafter, Martin and other similarly situated owners of overriding royalty under land in the unit, applied to the Corporation Commission for an order clarifying its previous Orders Numbered 24158, 24402, 26021, 27218 and 28533, and the Plan of Unitization adopted thereby, "in so far as said orders and Plan relate to the assessment of the costs of constructing and operating the processing plant" and equipment above referred to. After a hearing and rehearing on the matter, the Corporation Commission entered its Report and Order No. 29870. The part of said Report designated as "Order" is as follows:

"It is therefore ordered by the Corporation Commission of Oklahoma,

AS FOLLOWS:

"1. That it intended and understood its Orders Nos. 24158, 24402, 26021, 27218 and 28533 to mean that each owner of interests in a leasehold included within the Plan of Unitization is entitled to receive that portion of all liquids produced by a unit operated plant represented by his fractional interest ownership of lease-hold production in the tract or tracts involved, out of that percentage of the total plant production assigned to such tract or tracts, and that in respect to participation in all of the plant production and all of the production of

oil, liquid hydrocarbons and gas produced by said unit, after processing through a unit operated plant, the royalty owners and overriding royalty owners were to be treated on the same basis.

"2. That by said orders and Plans it was intended and understood that the overriding royalty owners would not be required primarily to bear and pay any part of the cost of building, maintaining or operating any unit operated plant, but should only be liable in the event of a failure of the lessee primarily charged with such costs to pay such costs, and that to deduct from an overriding royalty owner's share of the plant processed liquids a portion thereof as a resonable charge for processing the gas to obtain such liquids would in fact impose upon such overriding royalty owner a share of the cost of operating such plant, contrary to the Commission's intention in approving such Plan.

"3. That the language which was used in such orders and Plans is properly interpreted in conformity with the Commission's intentions as hereinabove ordered and determined.

"4. That the cross-application to amend or modify the several plans of unitization be and it is hereby denied."

From said Order and the one of similar import entered before the rehearing, Constantin has perfected the present appeals (herein consolidated for briefing), and will hereinafter be referred to as Appellant. Martin and the other overriding royalty owners appearing herein will hereinafter be referred to as Appellees. The Corporation Commission will hereinafter be referred to merely as the "Commission".

■ At the outset, we observe that the original oil and gas leases creating the leaseholds, and ⅞ths working interests, of which a fractional part was reserved to appellees by assignments such as hereinbefore referred to, were never introduced in evidence. We will assume, however, that they were on Producers 88 forms (inferred to be "regular" in counsel's argument) and that, among the rights of which the lessors thereby divested themselves and granted to appellant, was the right to produce and market casinghead gas (gas produced in conjunction with oil) as well as so-called "dry gas", and oil, from the leased premises. In this connection see Hammett Oil Co. v. Gypsy Oil Co., 95 Okl. 235, 218 P. 501, 34 A.L.R. 275, and other cases discussed in Summers, Oil and Gas (Perm. Ed.) Vol. 3, sec. 595, and annotated at 82 A.L.R. 1304, and 34 A.L.R. 291. Most Producers 88 lease forms, of which there are several different types, prescribe the lessor's royalty on casinghead gas, or gas produced from oil wells, (like the gas involved here) as a fractional part of such production at the well, the wellhead, or "at the mouth of the well", less all costs of production. See Hopkins v. Texas Co., 10 Cir., 62 F.2d 691, 692, and Oklahoma Form Book Annotated, Kleinschmidt & Highley (8th Ed.) Secs. 1077–1089, both inclusive, and Summers, supra, Vol. 7, chap. 43. We think, by its wording, the hereinbefore quoted reservation creating appellees' overriding royalty followed the same pattern; and that the reservation "of all oil, gas and other minerals produced, saved and sold * * * and creditable to the interest reserved * * *" is sufficient to include casinghead gas, in the absence of any dispute concerning the matter, or evidence of a contrary intention by the parties to the contract and assignment. (The terms "other minerals" is in a different context in these instruments than it was as interpreted in Wolf v. Blackwell Oil & Gas Co., 77 Okl. 81, 186 P. 484.) We think it equally clear, however, that the reservation contemplated nothing beyond, or in addition to, "oil, gas and other minerals produced * * *" *in their natural state*; and does not give appellees the right to any portion of the proceeds of gasoline, pentanes, butanes, propanes or any hydrocarbons made, or manufactured from, such

raw gas. See New Mexico and Arizona Land Co. v. Elkins, D.C.N.M. 137 F. Supp. 767, 770, 771, citing definitions of "minerals" as substances found "in nature". Though the wording of the assignment in Danciger Oil & Refineries Co. v. Hamill Drilling Co., 141 Tex. 153, 171 S.W.2d 321, was more specific than that of the reservation and assignment form here involved, we think that, for the purpose of the present determination, there is no material difference between them, and our views here accord with those of the court in that case on the precise question here dealt with. We think such views and our conclusion that appellees' share is to be measured, and *becomes theirs*, at the mouth of the well, or wellhead, is further supported by other provisions of the reservation giving appellant, the "assignee", " * * * the right to deliver assignors' share of said products to the pipe line or lines to which it may connect the wells located upon said leasehold tracts", and providing for the execution of division orders to facilitate direct payment by the purchaser to them for their share of the products, and giving them the right, upon reasonable notice, to receive their share in kind. The Plan of Unitization did not change the character of the products in which appellees were thus reserved an interest. While said Plan's Sec. I(f) defines "Unit Production" as "all oil and gas produced from the unit area * * *" and, opposite "(e)" in the same section, "Oil and Gas" is defined as including "casinghead gasoline, gas distillate or other hydrocarbons * * *" (in addition to oil and gas) there is no provision specifically giving the owners of overriding royalty interests any interest in the proceeds of those types of unit "production". The second paragraph of Sec. VII of the Plan provides:

> "The unit production allocated to each separately owned tract shall be divided among the several persons entitled to share in the production from such separately owned tract, in the same manner, in the same proportions and upon the same conditions, that they

would have participated and shared in the production of such separately owned tracts had not the unit been organized, and with the same legal force and effect."

Section VI, among other things, provides:

> " * * * Property rights, leases, contracts, and all other rights and obligations in respect to the oil and gas rights in and to the several separately owned tracts within the Unit Area * * * shall be and are hereby amended and modified *to the extent necessary* to make the same conform to the provisions and requirements of this Plan of Unitization, but otherwise to remain in full force and effect." (Emphasis ours.)

No attempt was made at the hearings before the Commission to show that the appellees' share of the gross natural production of the unit wells could not be computed from the volume of such production as measured at the wellheads, and appellees paid therefor on the basis of the market value thereof, or that it was to any "extent necessary" to amend, modify or change the character of the production they were entitled to under their reservation to "conform to the provisions and requirements" of the Plan. Nor was there any showing that said gas then in its raw and natural state is valueless, or that there is no market therefor. In this connection notice Armstrong v. Skelly Oil Co., 5 Cir., 55 F.2d 1066, and Danciger Oil & Refineries Co. v. Hamill Drilling Co., supra. After a thorough examination of the Plan's various provisions we find no ambiguity therein which is of any force and effect as a deterrent to our conclusion that appellees' rights and obligations extend no further than receiving, free of cost (at least until their assignee fails to pay his share of the unit expenses, which contingency is not shown to have arisen) their share of the value of the casinghead gas, as aforesaid, and that the character of the products, to which their share applies, has not been shown to be necessarily affected by the

Plan of Unitization. Being entitled to no more than a share of this raw, or natural, production, they are entitled to none of the hydrocarbons or other products made, manufactured or processed therefrom. Similarly, they are not obligated to pay any of the cost of deriving such commodities from such production, without their assent (unless such obligation might come into being upon the creation of a lien thereon in some one of the ways provided by law). Without the showing of modification necessity above referred to, and without any question being raised or determined, at the time the Commission approved the Plan, as to the overriding royalty owners' rights in the by-products, how can the Commission's subsequent expression, in the orders appealed from, of its previously unexpressed intention in entering the approval order, change the situation? To interpret the Plan in accord with that expression, is not only to do violence to the Plan's plain provisions, it constitutes an indirect or circuitous way of changing the provisions of appellees' reservation with no apparent consideration, adjudication or interpretation of them, or justification (under the above quoted Section VI of the Plan) for such change. We therefore, hold that the order was erroneous and without legal justification, or substantial evidence to support it. In this connection see Application of Little Nick Oil Co., 208 Okl. 695, 258 P.2d 1184, 1189. We also hold that appellees are not entitled to any share of the hydrocarbons' proceeds, as such. However, if convenience or other considerations dictates paying them for their share of the casinghead gas by paying them a portion of such proceeds, then such payment should not be made without deduction of a reasonable charge for processing, Ludey v. Pure Oil Co., 157 Okl. 1, 11 P.2d 102; but their net receipts, in no event, should be less than their proportionate share of the market value of the Unit's gross casinghead gas production. In this connection see the definition of overriding royalty quoted in Cities Service Oil Co., v. Geolograph Co., 208 Okl. 179, 183, 254 P.2d 775, 780. (The

problem of finding a formula whereby a uniform price may be paid to owners of interests in natural gas sold in its raw state, and to other owners of like interests in gas from the same field *that is not sold previous to processing,* is not a new one. It has been present in the gas price-fixing cases. Notice the quotations and discussions of the Commission's Orders Numbered 26096 and 28884 in Natural Gas Pipe Line Co. v. Corp. Comm., Okl., 272 P.2d 425 and Cabot Carbon Co. v. Phillips Pet. Co., Okl., 287 P.2d 675, 677, respectively; and Phillips Pet. Co. v. State of Oklahoma, 340 U.S. 190, 71 S.Ct. 221, 222, 95 L.Ed. 204, referring to "the determination by an integrated company of proceeds realized from gas at the wellhead" as involving "complicated problems in cost accounting."). It would seem a simple enough matter to pay appellees for their share of this production at the wellhead, in the absence of any showing that under the unit "set up" this cannot be done. Therefore, it is neither necessary nor appropriate, if possible, for this Court, without the necessary data, to attempt to arrive at what fractional part of the total gross value of the Unit's hydrocarbon production appellees *might* be paid. Suffice it to say, in accord with the views above expressed, the orders appealed from should be vacated. It is so ordered.

JOHNSON, C. J., and CORN, JACKSON and HUNT, JJ., concur.

WILLIAMS, V. C. J., and HALLEY, J., dissent.

WILLIAMS, Justice (dissenting).

I do not agree with the majority opinion and do not feel that such opinion accurately states all of the facts and issues involved or the law applicable thereto. I therefore feel impelled to present my view of the case.

The expensive plant referred to in the majority opinion is more than just a gasoline plant and contains equipment for processing gas, separating and stabilizing

crude oil and furnishing gas under pressure for cycling and pressure maintenance programs in order to increase the ultimate recovery of gas and oil throughout the entire field.

In the operation of the Unit and the plant, all production from the various producing wells on the leases included in the Unit area is piped directly to the plant. At the plant, the gas and oil are separated and the oil is then sold. The gas, which is a wet gas, is then processed through the equipment in the plant which extracts from this gas the liquid hydrocarbons, that is, gasoline, butane and propane, and these liquid hydrocarbons are then sold. The dry gas remaining after the extraction of these liquid hydrocarbons, is then compressed and injected back into the reservoir as a part of the re-cycling and pressure maintenance program for the operation of the field in order to increase the ultimate recovery of gas and oil.

The only proposition of error presented by appellant is that the Corporation Commission has misconstrued the Plan of Unitization and the Statute in allowing overriding royalty owners the full value of products manufactured from their share of Unit production, free of cost of manufacture, by confusing the rights of basic royalty owners, acquired by contract, with those of overriding royalty owners who had no such contractual rights.

Appellant contends that the overriding royalty owners must share in the expense of extracting the liquid hydrocarbons, and that the plant owners and operators are entitled to retain a portion of the sale price of such products to cover such expense. The gist of appellant's argument seems to be that there is nothing in the Plan of Unitization which entitles any of the royalty owners to participate in the proceeds of the sale of the hydrocarbons without deduction of the cost of processing the gas whereby said hydrocarbons are obtained; that the right to so participate was transferred to the basic royalty owners by contract separate and apart from the unit plan, but that no such contract was ever made or entered

into with the overriding royalty owners and that such overriding royalty owners are therefore not entitled to so participate without cost. Such argument does not appear to be supported by the record herein, however.

Analysis of the facts, as presented by the record in this cause, will reveal that Martin and others were entitled by contract with appellant to receive 5/16ths of the production of the oil and gas leases assigned, free and clear of the cost of production and operation of the leases, which was assumed by appellant, as assignee. Thereafter appellant joined with other lessees and formed under Oklahoma Law, a Unit Plan of operation. This plan of unitization was prepared by the lessees and approved by the Corporation Commission. The majority opinion only refers to two paragraphs of such plan, but the pertinent provisions thereof, insofar as this controversy is concerned, are as follows:

"Plan of Unitization of Elk City Hoxbar Sand Conglomerate Unit.

"Know All Men By These Presents:

"The following shall constitute the Plan of Unitization applicable to the Elk City Hoxbar Sand Conglomerate Unit created pursuant to the authority of House Bill No. 339 of the 1945 Legislature of the State of Oklahoma, and having for its purpose the unitized management, operation, and further development of the Hoxbar Sand Conglomerate common source of supply of oil and gas underlying the lands outlined by the solid line on the map hereto attached and marked 'Exhibit A', all to the end that a greater ultimate recovery of oil and gas may be had therefrom, waste prevented, and the correlative rights of the respective owners protected.

"I

"Definitions

"As used in this Plan of Unitization, the following terms and expressions are defined as follows:

"(a) 'Unit' shall mean the Elk City Hoxbar Sand Conglomerate Unit.

\*   \*   \*   \*   \*   \*

"(e) *'Oil and Gas' shall not only refer to oil and gas as such in combination one with the other, but shall have reference to oil, gas casinghead gas, casinghead gasoline, gas distillate, or other hydrocarbons, or any combination or combinations thereof, or any one thereof,* which may be found in or produced from the Unit Area.

"(f) 'Unit Production' shall mean and include all oil and gas produced from the Unit Area from and after the effective date hereof regardless of the well or tract within the Unit Area from which the same is produced.

"(g) 'Lessee' shall mean any owner, in whole or in part, of an oil and gas lease or any unleased mineral interest, who alone or in association with another person or persons has the right, except for this Plan of Unitization, to explore, develop, and operate a separately owned tract for oil and gas. *An owner of an overriding royalty interest, oil payment, net profit contract, or other oil and gas rights of a similar nature, who does not have the right to develop and operate,* shall not be regarded as a lessee.

"(h) 'Unit Operator' shall mean and refer to the lessee designated to carry on and conduct the unitized operations within the Unit Area as provided in Section I hereof.

\*   \*   \*   \*   \*   \*

"(k) *'Unit Expense' shall include any and all cost, expense, or indebtedness incurred by the Unit or Unit Operator as authorized by this Plan of Unitization or the order of the Commission creating the Unit.*

\*   \*   \*   \*   \*   \*

"VI

"Effect of Unitization

"The adoption of this Plan of Unitization and the creation of the Unit as herein provided shall have the effect from and after the effective date of unitizing all further development and operations for the production of oil and gas from the Unit Area and of pooling and unitizing the production so obtained, all to the same extent as if the Unit Area had been included in a single lease and all rights thereunder owned by the lessees in undivided interests. Property rights, leases, contracts, and all other rights and obligations in respect to the oil and gas rights in and to the several separately owned tracts within the Unit Area, from and after the effective date hereof, shall be and are hereby amended and modified to the extent necessary to make the same conform to the provisions and requirements of this Plan of Unitization, but otherwise to remain in full force and effect. \* \* \*

"Nothing herein contained shall be construed to require or result in a transfer to or the vesting in the Unit of title to the separately owned tracts within the Unit Area or to the leases thereon, other than the right to use and operate the same to the extent set out in this Plan of Unitization; nor shall the Unit be regarded as owning any of the Unit Production. *The Unit Production and the proceeds from the sale thereof shall be owned by the several persons to whom the same is allocated under this Plan of Unitization.* \* \* \*

"The amount of the unit production allocated to each separately owned tract and only that amount, regardless of the well or wells in the Unit Area from which it may be produced, and regardless of whether it be more or less than the amount of the production from the well or wells, if any, on any such separately owned tract shall, for all intents, uses, and purposes, be regarded and considered as production from such separately owned tract. \* \* \*

## "VII

### "Allocation and Disposition of Unit Production

"*All unit production as it is delivered by the Unit from the plant or plants or other facilities,* except so much thereof as is used or consumed in developing, operating, cycling, repressuring, maintaining pressure, and in other operations carried on in accordance with this Plan of Unitization, or is unavoidably lost, *shall be apportioned among and allocated to the several separately owned tracts within the Unit Area,* in accordance with the Formula which is attached hereto as 'Exhibit B'.

"*The unit production allocated to each separately owned tract shall be divided among the several persons entitled to share in the production from such separately owned tract in the same manner, in the same proportions, and upon the same conditions that they would have participated and shared in the production from such separately owned tract had not the Unit been organized, and with the same legal force and effect.* Each of such persons shall separately own, and shall separately take or sell its share of allocated unit production, and, in the latter event shall be entitled to receive payment directly from the purchaser.

"*The share of the unit production allocated to each separately owned tract shall be delivered in kind to the persons entitled thereto by virtue of ownership of oil and gas rights therein, or to their vendees, or shall be delivered to the pipe line to the credit of such persons.* Persons entitled to take and receive in kind any portion of the unit production shall have the right at their own expense to construct, maintain, and operate within the Unit Area facilities for that purpose, provided the same are so constructed, maintained, and operated as not to interfere with the operations carried on pursuant hereto.
* * *

"The Unit Operator shall have the right to take and utilize or use so much of the unit production as may be necessary or desirable in the development and operation of the Unit Area, including, but without being limited to, the use of gas, including residue gas, for cycling, repressuring, pressure maintenance, or other operations under this Plan of Unitization. No royalties, overriding royalties, production payments, or other payments shall be required or payable upon or with respect to the portion of the unit production so taken and utilized or used, or that which is unavoidably lost.

*  *  *  *  *  *

"(2) The Operating Committee shall have the general overall management and control of the Unit and the conduct of its business and affairs and the operations carried on by it, and is authorized and empowered, subject to the terms and provisions hereof, to do all things necessary, proper, and convenient for carrying out the terms and spirit of this Plan of Unitization and to that end, not excluding or limiting any other power or powers that may be necessary or proper for that purpose, shall have the following specific power and duties:

*  *  *  *  *  *

"(h) *To approve and authorize the purchase, construction, location, abandonment, sale, or other disposal of any processing plant, compressor plant, gasoline plant,* tank batteries, salt water disposal system, or other facilities serving the Unit Area, or to contract with the owners of an individually owned plant or facilities to render in whole or in part the service desired.

*  *  *  *  *  *

### "XI

### "Unit Expense

"The Unit Operator in the first instance shall pay and discharge all cost

and expense incurred in the development and operation of the Unit Area and in the conduct of the activities and affairs of the Unit. Such cost and expense shall be computed in accordance with the Accounting Procedure hereto attached, marked 'Exhibit C' and made a part hereof. Any cost or expense not contemplated by 'Exhibit C' shall be subject to approval of the Operating Committee.

"All such Unit Expense as it accrues shall be charged to the several separately owned tracts in the Unit Area in proportion to the percentage of interest of such tracts in and to Unit production.

"Except as may be otherwise hereinafter specifically provided, a lessee or lessees obligated or responsible for the cost and expenses of operating a separately owned tract for oil and gas in the absence of unitization shall, in the same proportion and to the same extent, be chargeable with and responsible for the payment of the unit expense charged against such separately owned tract, after such tract has become a part of the Unit Area. * * *

"The Unit shall have a first and prior lien upon the leasehold interest (exclusive of a ⅛ royalty interest) in and to each separately owned tract, the interest of the owners thereof in and to the Unit production and all equipment in possession of the Unit, to secure the payment of the Unit Expense and other items of cost charged to and against such separately owned tract, *provided such lien may be enforced as against overriding royalty, oil and gas payments, royalty interests in excess of a ⅛ of the production, or other interests which otherwise are not chargeable with such costs, only in the event the owner of the interest or interests primarily reponsible fails to pay such unit expense when due. In the event the owner of any royalty interest, overriding royalty, oil and gas payment, or other interest which under the Plan of Unitization is not primarily responsible therefor pays any part of such unit expense in whole or in part the owner thereof shall, to the extent of such payment, be subrogated to all the rights of the Unit and of the Unit Operator with respect to the interest or interests primarily chargeable with such unit expense.* A ⅛ part of the unit production allocated to each separately owned tract shall in all events be regarded as royalty and shall be free and clear of all unit expense and free of any lien therefor. The lien hereinabove provided for shall be for the use, benefit, and protection of Unit Operator or other lessees or persons entitled to receive or share in the monies, the payment of which is secured thereby, and, in the event of failure of the Unit to enforce such lien, the Unit Operator or other person entitled to the benefit thereof shall be subrogated to the lien rights of the Unit, including the right of foreclosure.

* * * * * *

"(a) As soon as practical after the effective date, the Unit shall make the necessary preparations therefor, and with diligence and in accordance with good engineering and production practices engage in cycling, pressure maintenance or repressuring operations through the return of gas to the reservoir to the extent and in the manner best calculated to result in the greatest ultimate recovery of oil and gas from the Unit Area. *In so doing, the Unit is authorized to construct, purchase, or otherwise acquire and operate such gasoline plants, processing plants, or compressor plants, and other facilities as may in the best judgment of the Operating Committee be desirable for that purpose,* or is authorized, should it so elect, to contract with the owners of an individually owned plant or plants and facilities to render in whole or in part the desired services in connection therewith.

"(b) Liquid hydrocarbons produced from the Unit Area shall be produced from those wells in the Unit Area from which the same can be obtained with the smallest loss or dissipation of reservoir energy reasonably possible under practical operation conditions as they may exist from time to time.

"(c) Wells which produce liquid hydrocarbons with gas-oil ratios found to be excessive in relation to the gas-oil ratios of other wells producing liquid hydrocarbons from the Unit Area shall be shut in or the production therefrom restricted in such manner as to make the most effective utilization of the gas energy of the reservoir reasonably possible under practical operating conditions as they may exist from time to time.

\*     \*     \*     \*     \*     \*

"(e) Gas (other than gas produced in connection with the production of liquid hydrocarbons) shall be produced from the Unit Area only at such time or times and in such manner as in the judgment of the Operating Committee such gas may be produced without materially decreasing the quantity of liquid hydrocarbons economically recoverable from the Unit Area." (Emphasis added.)

The foregoing provisions of the Plan of Unitization would appear to be relatively plain and free from ambiguity. The plan specifically provides that any production shall mean and include all oil and gas produced in the unit area, and oil and gas is defined as meaning and including not only oil and gas, but oil, gas, casinghead gas, casinghead gasoline, gas distillate or other hydrocarbons or any combination or combinations thereof or any one thereof. This certainly means everything that is produced, and obviously includes the hydrocarbons which are involved in the present controversy. It might be noted in this regard that the only way that casinghead gasoline and other hydrocarbons could be produced, from this unit at least, would be by extracting

them from the wet gas produced from the wells. The plan further provides that all unit production as it is delivered by the unit from the plant or the plant facilities shall be apportioned among and allocated to the separately owned tracts within the unit area. Such phaseology obviously should not mean that only a portion of the unit production should be allocated back to the mineral owners. The plant owners as such are not authorized to withhold any of the production from the unit for their own use, save and except that which is necessary for the development and operation of the unit area, such as the use of residue gas for cycling, repressuring and pressure maintenance. Unit expense as defined by the plan, includes any and all costs, expenses or indebtedness incurred by the unit or the unit operator, and certainly includes the cost of constructing and operating the plant here involved. Under the terms of the plan, the lessees are required to pay all of this expense. The term lessee is defined by the plan to mean the owner in whole or in part of oil and gas leases and it is specifically provided that overriding royalty owners shall not be regarded as lessees. To impose a charge on the overriding royalty owners for processing the gas through the plant to extract the hydrocarbons therefrom would, in fact, impose upon such overriding royalty owners a share of the cost of operating such plant, in direct contravention of the plain provisions of the plan of unitization, and I am of the opinion that the Commission was eminently correct in so holding.

Appellant argues that the operators, or lessees, are only obligated to produce and operate the leases and are not obligated to process the wet gas to extract the hydrocarbons therefrom; that the plan and order do not require the construction and operation of the processing plant and that the obligations of the lessees could have been met by simply repressuring and recycling the wet gas produced from the wells without processing the same and extracting the hydrocarbons therefrom. Such statements are true, but I do not see how they help appellant's case. Neither the plan of unitiza-

tion nor the order of the Commission requires the lessees to build the plant and extract the hydrocarbons from the gas prior to reinjecting the gas into the reservoir, but such plan and order authorize such lessees to take such action provided they do so at their own expense. The order appealed from does not force the operators to process the royalty owners gas free of charge; it simply tells the operators that if they choose to extract the hydrocarbons from the gas produced, they must account to the owners thereof for all of the hydrocarbons so extracted.

Appellant also suggests that the original plan did not contemplate the erection of a multi-million dollar processing plant and that when such plan provided that the operators would pay unit expense it was not contemplated that such expense would include the cost of constructing and operating such a plant, and that at the time the order approving such plan was entered there was no issue presented concerning the division of the products of such plant and that the order entered could not have decided such issue and that the Commission therefore cannot now interpret such order as deciding an issue which was not presented. The majority opinion apparently adopts such view, but the record completely refutes such argument. The record reveals that the plan for unit and plant operation was conceived and proposed by Shell Oil Company and that on March 8, 1950, a meeting of operators in the Elk City Field was held at which time a representative of Shell Oil Company proposed in substance the plan later adopted. At such meeting, which was attended by Martin and Ellison, Shell's proposed plan was briefly outlined as being:

1. The operation of the Elk City Field under gas cycling and pressure maintenance programs which would necessitate complete unitization of the field.

2. The construction at unit expense of a gasoline plant for processing gas, stabilizing crude oil and furnishing gas under pressure for cycling and pressure maintenance programs, the capacity of the plant to be 100 million cubic feet of gas per day and the cost of construction approximately $6,000,000.

Shell's representative outlined the plan as contemplating the entire well effluent flowing to the plant under 900 to 1000 pounds pressure so that there would be no waste of any hydrocarbons, and suggested that the procedure to accomplish the objective and obtain the benefits of the proposed program would be:

1. The operators should agree in principle to unitization under the Oklahoma Unitization Law of all working interests and royalty interests in the common source of supply.

2. The operating companies should develop plans for gas cycling and pressure maintenance programs and participation factors for unitization.

3. The unit should build a gasoline plant and pay ⅛ royalty on all plant products sold.

It was stipulated that Shell's representative would testify that Shell Oil Company, for policy reasons, proposed and agreed to pay all of the royalty owners and all of the lessees one hundred percent of all the products of the plant, and that the reason for this was that when the plan of unitization was discussed, it was stated what while it might be proper to impose upon the royalty owners some cost of the processing, the matter of debating what charge should be made against the royalty owners, and one thing and another, would so impede the actual formation of the unit that it would be better in all instances to simply pay the royalty owners one hundred percent and evade any debate whatever as to what would have been a proper charge.

Thereafter the plan of unitization above set out was prepared and submitted to the Corporation Commission for approval, and on October 27, 1950, the Commission entered its order creating the Unit and approving the Plan of Unitization. The point to be noted here is that at least two of the overriding royalty owners were present at and participated in the conferences where the

plan was proposed and were represented by counsel before the Commission when the order approving the plan was entered. The plan as submitted specifically mentions and defines overriding royalty owners, basic royalty owners and lessees and specifies the obligations of each with regard to payment of costs. The statute then in effect, 52 O.S.Supp.1947 § 286.4 specifically enjoined upon the Commission the duty of ordering the creation of the unit and approval of the plan of unitization only upon such terms and conditions as might be fair, reasonable, equitable and which are necessary or proper to protect, safeguard, and adjust the respective rights and obligations of the several persons affected, including royalty owners, *owners of overriding royalties,* and others, as well as the lessees. The argument that there was no issue presented to the Commission at the time of the original order approving the unit plan as to rights of overriding royalty owners is obviously without merit. The statute under which the parties were then proceeding raised the issue and imposed upon the Commission the duty of deciding it, whether raised by the lessees or not. We cannot presume that the Commission did not carry out its statutory duty, particularly in the face of its own finding that it did.

There is also in the record a letter of recent date from the same representative of Shell Oil Company above mentioned to one of appellant's attorneys in which such representative stated that by royalty owners he had in mind those owners of minerals who had to consent to the Unit Plan before it could become effective and that he didn't believe that the position of the overriding royalty interests was ever mentioned at the original meetings of the lessees. Appellant argues at length, on the basis of this letter, that 52 O.S.1951 § 287.5, requires that a plan of unitization be signed or approved by owners of record of not less than 63% of the normal ⅛ royalty interest in and to the unit area before it can become effective, and that in order to secure such approval in the instant case, the lessees voluntarily extended to such basic royalty owners the right of 100% participation in the plant products without cost to them, but that since it was not necessary to have the approval of the overriding royalty owners in order to make the plan effective there was no reason or need to extend such right of participation to them and the same was therefore not done. The most obvious fallacy in this argument, other than its lack of pertinence, is that the statute relied upon as requiring the approval of 63% of the basic royalty owners to the plan was not enacted until 1951. The order of the Commission approving the plan here involved was promulgated in 1950, and all the negotiations and preparations above outlined occurred prior to that time, and at all such times there was no statute requiring the approval or consent of any royalty owners, basic or otherwise, to such plan. As already stated, the unit here involved was proposed, created and approved under the authority and provisions of Title 52, chapter 3b, of the Oklahoma Session Laws 1945, later repealed. Such Act required only the approval of the lessees and the Commission to any plan of unitization. Royalty owners, both basic and overriding, had the right to appear before the Commission and protest the proposed plan, but their approval was not required, and they were both dependent upon the Commission for the protection of their rights. Appellant's argument that there was a valid reason for differentiating between basic royalty owners and overriding royalty owners is completely without basis or merit.

If there were any ambiguity in the Plan of Unitization here involved and the original order of the Commission approving the same, the same has been resolved by the orders herein appealed from. The power of the Commission to so clarify its previous order cannot be doubted in view of the express provision of the Plan reserving to the Commission continuing jurisdiction over the Unit for the purpose of determining, modifying and interpreting the terms and provisions of the Plan, the provision of 52 O.S.1951 § 112, and the opinion of the Circuit Court of Appeals in the case of

Constantin v. Martin, 10 Cir., 216 F.2d 312, and such can be done without invading the exclusive province of the courts. Cabot Carbon Company v. Phillips Petroleum Co., Okl., 287 P.2d 675.

I find no error in the orders appealed from and am of the opinion the same should be affirmed.

I therefore dissent.