CEDAR CREEK OIL & GAS CO., Respondent, *v.* ARCHER
ET AL., Appellants.

(No. 8,154.)

(Submitted June 10, 1941.   Decided October 2, 1941.)

[117 Pac. (2d) 265.]

478

*Mr. Al Hansen* and *Mr. Sam D. Goza, Jr.*, for Appellants, submitted a brief and argued the cause orally.

*Mr. Denzil R. Young*, for Respondent, submitted a brief and argued the cause orally.

MR. JUSTICE MORRIS delivered the opinion of the court.

This is an action in the nature of an action to quiet title. The purpose of the plaintiff is to have a certain drilling agreement declared null and void, and cancelled on the records of Fallon county, in order to remove a cloud from plaintiff's title to an oil and gas lease.

The lease was entered into January 12, 1929, between the plaintiff and the then owner of the leased land, George W. Sawyer. Sawyer subsequently died and the title to the land was acquired by Clarence S. and Frances Doherty Lillie, husband and wife, jointly. The owners of the land are not parties to the action. February 21, 1931, the plaintiff, the lessee, and the principal defendant, C. L. Archer, entered into a drilling agreement covering the land involved, which will hereafter be adverted to section by section.

The operator sold and assigned royalty interests in the land to some ten or twelve other parties, and it appears that the money obtained from such sales of royalty was used to carry on the drilling operations. The landowners will hereinafter be referred to by that term, the lessee as the plaintiff, and Archer as the operator.

The drilling operations were commenced May 1, 1931, and diligently proceeded with in accordance with the agreement, and on July 1 such operations resulted in bringing in a gas well capable of producing in excess of twelve million feet of gas per day. Gas having been produced in commercial quantities, the next step was to obtain a market therefor. Each party, both in the respective pleadings and arguments, contends that the primary obligation to obtain a market for the gas was on the other, and each alleges loss due to the other's negligence in this particular.

The pleadings are extensive and contain a great deal of matter that, it appears to us, is of little value in interpreting the drilling agreement, and it is in that instrument that we must discover the respective obligations of the parties. In construing that instrument, however, it will be necessary to take into account certain extrinsic evidence tending to show how the parties construed certain provisions of the contract relative to which there is sharp conflict. Only such pleadings and evidence will be commented upon as bear upon the question as to whose duty it was to find a market for the gas and other questions and contentions relating to such marketing, and such comments

will be made when the respective questions are taken up for consideration.

The trial court was exceedingly lenient with the litigants in granting motions to amend the pleadings. Such leniency was exercised within the court's discretion and no issue is made as to the exercise of that discretion. A number of demurrers were interposed as the pleadings progressed, all of which were overruled. By stipulation the cause was tried to the court without a jury. Many of the facts were also stipulated. The testimony of witnesses for both parties was heard, and numerous exhibits were received in evidence. When the evidence was all in, the plaintiff moved for judgment on the pleadings, which was denied. Briefs were filed and in due course the court made and entered its findings of fact and conclusions of law, which were generally in favor of the plaintiff.

The findings were elaborate and their import is logically expressed by the conclusions of law, which we here set out in full:

"1. That it was the duty of defendant Archer and of his assignees, the remaining defendants, by the express covenant in the sublease or drilling agreement to drill a second well on the leased premises by May 1, 1932, and that the said defendants' failure so to do constituted a forfeiture of all their right, title and interest in the sublease or drilling agreement.

"2. That plaintiff is not estopped or precluded from enforcing such forfeiture.

"3. That plaintiff is entitled to a decree declaring said sublease or drilling agreement to be null and void and cancelled of record, and that defendants, and each and all of them, be forever barred and enjoined from asserting any right, title or interest in plaintiff's oil and gas lease, said sublease or drilling agreement, said described premises, or any of the oil or gas produced therefrom.

"4. That plaintiff is entitled to its costs and disbursements herein. Let judgment be entered accordingly."

Judgment was entered accordingly. The defendants appealed, specifying eleven specifications of error. As we have already outlined what we deem as the essential scope of our re-

view in the premises, we think it unnecessary to take up these assignments of error in detail. The substance of the whole, in so far as we deem pertinent, will be covered by our opinion.

Before proceeding with the consideration of the merits of the controversy, we will dispose of some of the contentions of counsel which, in our opinion, are not within the essentials, but which we do not wish to have it appear to the trial court or counsel that we have ignored.

There was not a little controversy over the question as to █ whether the operating agreement set out above should be legally classified as an operating agreement or a sublease. The two contracts are separate and distinct. The plaintiff entered into the lease contract with the landowner and then entered into the "drilling agreement" with the operator, by which the latter agreed, for a percentage of the oil and gas discovered and saved, to carry out the obligations that were assumed by the plaintiff in the lease agreement between the plaintiff and the landowner. The operating agreement, of course, relates to the lease, but there is no direct relation between the operator and the landowner, and it is our opinion that the agreement between plaintiff and Archer, the operator, must be classed strictly as a drilling agreement or a plain operating contract. The form and contents of the drilling agreement do not follow the terms of an ordinary oil and gas lease. We are furthermore of the opinion that irrespective of how the drilling agreement may be classified, its terms must be applied in accordance with the general rules and the laws relating to ordinary contracts. The landowner or lessor would have no right of action against the operator for the breach of any provision of the operating agreement. Any remedy the landowner might seek for breach of the lease would necessarily have to be sought from the lessee, the plaintiff here.

Another phase of the controversy between counsel which was █ emphasized both in the pleadings and arguments is that each party vigorously contends that the other is a speculator. We can see no sound reason for applying the term of "speculator" to either of the litigants in a way that could be con-

strued to mean a matter of reproach or censure. When the lessee acquired his lease, and when the operator in his agreement with the lessee acquired certain contingent rights in the lease, each acquired a right of property which no provision of the law prohibits either from disposing thereof, and both exercised that right by assigning certain portions of the royalties in both the gas and oil to others. It does not appear that the plaintiff assigned royalties to more than one party. These assignments were within the law and were regularly recorded in Fallon county. All oil and gas development operations are more or less in the nature of speculation, but this has no bearing on the merits of this controversy.

It appears from the record that the plaintiff has oil and gas leases and government permits on approximately 2,800 acres of land in the gas field, and some five or six other producing wells in that field, and the evidence tends to show that all of this property is handled by arrangements similar to that existing between the plaintiff and defendant here; that is, the plaintiff obtains oil and gas leases on the lands under the terms of which the plaintiff agrees to turn over to the landowner a specified portion of the gas and oil produced or the proceeds of such portion, where the power to sell is vested in the lessee, and plaintiff then turns the lease or leases over to a driller, such as the operator in the case at bar, for a less percentage of production than is reserved to the landowner. Take the lease involved in this controversy for illustration: Under the lease between the landowner and the plaintiff as originally made, and prior to the modification agreement entered into between the landowner and the plaintiff in 1936, which will be presently adverted to, the consideration for the lease running to the land owner is 12½ per cent. of the oil produced and saved, and $300 cash per annum for the gas from each well where the gas is used off the premises. With this lease in hand, plaintiff entered into the above "drilling agreement" with the operator. Under this agreement the consideration running to the operator is 80 per cent. of the oil and 75 per cent. of the gas. It will be noted that under this agreement the plaintiff will receive

7½ per cent. of the oil which cost him nothing except expenses incurred in obtaining the lease, and 25 per cent. of the gas or the proceeds thereof, which cost plaintiff $300 for each well producing gas in commercial quantities. In other words, the plaintiff is sitting in between the landowner and the operator and, in case of production, getting a nice "rake-off" at small risk as compared with the costs and risk of the operator who drills the wells.

It logically follows that, in our opinion, the trial court was in ▮ error where, in its findings of fact, the plaintiff was given the status of a landowner lessor and as one entitled to the benefit of the exception to the general rule relating to forfeitures as applied in oil and gas leases in favor of the lessor, which is discussed at length in the case of *Solberg* v. *Sunburst Oil & Gas Co.*, 76 Mont. 254, 246 Pac. 168, and a number of other cases decided by this court, in which the rule referred to was mentioned and applied. (See *Severson* v. *Barstow*, 103 Mont. 526, 63 Pac. (2d) 1022; *Berthelote* v. *Loy Oil Co.*, 95 Mont. 434, 28 Pac. (2d) 187; *Abell* v. *Bishop*, 86 Mont. 478, 284 Pac. 525; *McDaniel* v. *Hager-Stevenson Oil Co.*, 75 Mont. 356, 243 Pac. 582.)

The plaintiff, in order to give force to its allegations and contentions that the operator was a mere speculator, directs attention to the fact that the operator disposed of all of his interest in the potential production of the wells he agreed to drill under the operating agreement, except 4 per cent. of the gas and 9 per cent. of the oil. If the contention were meritorious, the offense is mitigated to some extent by the fact that 33 per cent. was taken and held by Archer's wife.

Plaintiff contends that the implied covenants of the drilling ▮▮ agreement place the obligation on the defendant Archer to market the gas, but cites no authority on that point. We find in *Brimmer* v. *Union Oil Co.*, (10 Cir.) 81 Fed. (2d) 437, 105 A. L. R. 454, that an oil lease, such as under consideration there, carried an implied covenant to market the oil, but the development in that case was from federal land under government permit and the lease specifically provided that the considera-

tion in the way of royalty and a bonus should be paid in cash. Here plaintiff's share is 25 per cent. of the gas with an option to buy at the market price granted to Archer. An option is a unilateral agreement binding on the parties only if the optionee exercises his option. Archer not only did not exercise his option but expressly waived it in his letter to the plaintiff dated November 5, 1934, more than three years before this action was begun. (See *Merk* v. *Bowery Min. Co.*, 31 Mont. 298, 78 Pac. 519; *Snider* v. *Yarbrough*, 43 Mont. 203, 115 Pac. 411; 30 Words and Phrases, Perm. Ed., 5; 3 Bouvier's Law Dict., Rawle's Third Revision, p. 2421.) And the inclusion of the option in the drilling agreement furnishes no ground for the contention that such agreement carried an implied covenant binding Archer to find a market for the gas. It appears to us that such an option in the drilling agreement would imply exactly the opposite, for if the drilling agreement carried an implied covenant to market the product, the option was an idle gesture. We find no merit in the contention of an implied covenant to market in the operating agreement.

With these various contentions removed from further consideration, we will take up consideration of the drilling agreement.

The lease of January 12, 1929, between Sawyer, the original owner of the leased land, and the plaintiff, imposes these express covenants on the plaintiff: "1st. To deliver to the credit of the lessor, free of cost, in the pipe line to which *he* may connect *his* well the equal one-eighth part of all oil produced and saved from the leased premises. 2nd. To pay the lessor $300 each year in advance, for the gas from each well, where gas only is found  *  *·  *  . 3rd. To pay lessor for gas produced from any oil well and used  *  *  *  $300 per year." Gas only having been discovered and the lessee being obligated to pay an annual rental of $300 to the landowner for each well, the operator assumed no obligation under the drilling agreement relative to marketing the landowner's gas, as the landowner got no part of the gas.

May 19, 1937, the new owners of the leased land and the plaintiff entered into a new agreement, substituting in lieu of the rental of $300 per year for each gas well "15% of the proceeds from the sale of gas, * * * and where the gas is not sold lessee shall pay lessors $100 * * * per annum as royalty" for each well. Archer was not a party to this agreement, and it is not clear that he knew of such modification. The substituted consideration running to the landowners changed from $300 for each gas well to 15 per cent. of the proceeds of sales of gas and obligates the lessee, the plaintiff, to find a market for the landowners' gas, but such substitution could not affect any obligation of the defendant Archer in the premises, as he was not a party to the modification, and for the further reason, it will be noted, that the plaintiff's 25 per cent. of the gas is for the gas itself and not for a percentage of the proceeds realized from sales. Hence, Archer not having exercised his option to buy the plaintiff's portion of the gas, has no control over plaintiff's 25 per cent. thereof.

Taking up consideration of the drilling agreement, section by section:

Section 1 describes the lands to be drilled.

Section 2 expresses plaintiff's desire to have two wells drilled on the land described in the lease, a copy of such lease being attached to the agreement.

Section 3. The operator, for the nominal consideration of one dollar, is granted the exclusive right to go upon the leased land to explore for oil and gas. The real consideration is referred to as the covenants and agreements to be thereafter mentioned in the agreement.

Section 4. Plaintiff shall have 7½ per cent. of the oil produced and saved free in the operator's tanks at the well, *or to the credit of plaintiff with such pipe line as may connect with its lines with said tanks.* (Note: Plaintiff is to have credit with the pipe line company for its 7½ per cent. of the oil, not the proceeds thereof.) The operator takes 80 per cent. of the oil and the land owner 12½ per cent.

Section 5. Twenty-five per cent. of the gas produced is retained by the plaintiff "free of charge at the pipe line," and 75 per cent. is granted to the operator. The contract gives the plaintiff 25 per cent. of the gas, not 25 per cent. of the proceeds of cash sales.

Section 6. The operator shall deposit $500 in the Bank of Baker, Montana, as a bond to assure the operator's commencing drilling operations on or before May 1, 1931. The well to be drilled to the known gas sands of the field. The bond to be released on the completion of the well.

Section 7. This is the forfeiture clause. If gas is found in commercial quantities in the first well, the operator must commence a well on or before May 1, 1932, or forfeit all his rights under the terms of the agreement. (Note: The penalty imposed upon the operator, if he failed to commence the first well by May 1, 1931, was the implied forfeiture of the cash bond of $500.) The penalty for the failure to commence *a well* (obviously the second well) by May 1, 1932, if production is obtained in the first, is forfeiture of all rights acquired under the drilling agreement. The forfeiture in each instance shall be for failure to drill, not failure to market the product. No penalty is provided for failure to find a market.

Section 8. If the first well is a dry hole, no further drilling shall be required of the operator.

Section 9. If gas from the first well cannot be sold, the time for commencement of the second well shall be extended up to the time a market is secured.

Section 10 exempts the plaintiff from any liability for expenses, debts or other liabilities "governing such drilling operations."

Section 11 grants the operator an *option to purchase* first party's share of the gas or oil produced from the leased lands, *"at the wells or in the tanks or in the pipe lines that may connect said wells for the market price thereof."* (Note: This section of the operating agreement clearly and effectually nullifies any and all grounds for the contention that the operating agreement, by implied covenant or otherwise, imposes an obligation on the

operator to find a market for plaintiff's share of the oil or gas produced from the leased lands.)

Section 12. Plaintiff warrants title to the leased lands and provides that the agreement shall be binding upon the heirs, administrators, executors and assigns of either party.

The two last unnumbered paragraphs are confined to the usual attestation clause and signatures of the contracting parties and the acknowledgment.

This is a drilling agreement with all its vital provisions expressing the concentration of the minds of the parties on drilling operations, and its attendant risks and rewards. Each of the two forfeiture clauses relates solely to drilling operations and cannot be stretched to cover an alleged implied obligation to market the product.

On the question of forfeiture, section 7408, Revised Codes, provides: ''A condition involving a forfeiture must be strictly interpreted against the party for whose benefit it is created.'' See cases cited in note following the section in the Codes, in which cases both the rule and the exception are applied. We have followed the rule enjoined by this statute in our interpretation of the drilling agreement involved here, denying to the plaintiff the benefit of the exception to the rule for the reasons heretofore stated, but even without such rule we think plaintiff is not entitled to forfeiture under a fair and reasonable construction of the drilling agreement.

The correspondence between the parties set out in the transcript, running from about the time the operator should have commenced the second well, up to 1937 or 1938, shows clearly that plaintiff was dissatisfied with his lease agreement with the landowners. He complained about the burden of the lease provision which required the plaintiff to pay $300 per year for each gas well showing commercial production, and no gas being sold, and in effect stated in a number of letters that even if the second well were drilled, it would not increase the plaintiff's profit if sales were made to the only buyer available. The Gas Development Company, predecessor in interest of the Montana-Dakota Utilities Company, having made an

offer of 3½ cents per 1,000 cubic feet, taking only a limited portion of the gas. Plaintiff suggested to Archer that, as ·he was entitled to 75 per cent. of the gas produced, he should sustain a part of the rental burden until a satisfactory market was obtained, and Archer tacitly agreed to do so, and made one or two proposals to that· end, which it appears however were not acceptable to the plaintiff. Throughout the correspondence between the plaintiff and Archer there appear repeated expressions of intention to work out their problems for their mutual advantage. The plaintiff appears to have continued its efforts to have the landowners modify the lease on the rental provision, which finally resulted in the modification heretofore mentioned, by which 15 per cent. of the gas was accepted by the landowners in lieu of annual rental for each well of $300. Thereafter the plaintiff's cordial expressions as to cooperation with Archer theretofore employed were absent from its letters to him. Archer was in correspondence with the Gas Development Company as early as 1934, and in three different letters from that company looking to ironing out the difficulties obstructing contracting the sale of the gas to that company, Archer was advised that the landowners' refusal to modify the lease as to gas appeared to be the stumbling block in making such a contract. Archer and wife, and all royalty owners holding under Archer, except one who held but one per cent., and the landowners signed a contract to sell the gas to the Gas Development Company, but the plaintiff refused to sign. Its reason is not clear, but practically the only reason that could be assigned is necessarily grounded on the purpose to foreclose defendants' interests. Archer and wife signed in 1934, but it is alleged their contract was not delivered until 1935; Archer's assignees did not sign up until about or after this action was commenced.

We are not unmindful of the rule that in the review of a judgment founded on the findings of the trial judge, such review must be approached under the presumption that the findings and judgment are correct. (*Dover Lumber Co.* v. *Whitcomb*, 54 Mont. 141, 168 Pac. 947; *Great Northern Ry. Co.*

v. *Benjamin,* 51 Mont. 167, 149 Pac. 968; *Ringling* v. *Smith River Dev. Co.,* 48 Mont. 467, 138 Pac. 1098, and many other decisions in this jurisdiction.) And that the judgment of the trial court will not be set aside unless there is a clear preponderance of the evidence against it (*Loud* v. *Hanson,* 53 Mont. 445, 164 Pac. 544; *Copper Mountain Min. Co:* v. *Butte & Corbin etc. Co.,* 39 Mont. 487, 104 Pac. 540, 133 Am. St. Rep. 595; *Vesel* v. *Polich Trading Co.,* 96 Mont. 118, 28 Pac. (2d) 858), but after a careful analysis of the pleadings, the evidence, and especially the terms of the drilling contract, we are convinced that the equities are clearly with the defendants and that the judgment of the learned trial judge must be reversed.

Other contentions advanced have some bearing on the merits of the controversy, but we deem it unnecessary to pursue the matter further. We are satisfied that the drilling agreement gives the defendants no control over the 25 per cent. of the gas retained by the plaintiff, but does impose upon them the obligation to deliver plaintiff's 25 per cent. of the gas in the pipe line, the plaintiff, of course, to dispose of its share of the gas at its discretion.

The judgment is reversed and the cause remanded with instruction to the trial court to enter judgment in accordance with this opinion.

MR. CHIEF JUSTICE JOHNSON and ASSOCIATE JUSTICES ANGSTMAN, ANDERSON and ERICKSON concur.