XAE CORPORATION; Richard L. Beasley and Evelyn H. Lee as Co–Trustees of the Clayton E. Lee Irrevocable Trust; Evelyn H. Lee in her individual capacity; Rachel Beasley; William Lee Beasley; and Carl Jean Scully, Plaintiffs/Appellees,

v.

SMR PROPERTY MANAGEMENT COMPANY; SMR Preferred Partners II 1991 Limited Partnership; SMR Preferred Partners Development Fund 1992 L.P., a Delaware limited partnership; SMR Preferred Investors 1993 Limited Partnership; SMR Energy Inc.; SMR Natural Gas Income Fund 1993 Limited Partnership; Tandem Oil & Gas Company, L.L.C.; SMR Natural Gas Partners 1994 Limited Partnership; SMR Energy Inc–W.P.; and SMR Private Income Fund 1993 Limited Partnership, Defendants/Appellants.

No. 87466.

Supreme Court of Oklahoma.

June 9, 1998.

Rehearing Denied Nov. 3, 1998.

James C.T. Hardwick, Donna N. Blakley, Sharon Taylor Thomas, Hall Estill, Hardwick, Gable, Golden & Nelson, P.C., Oklahoma City, for Appellants.

Philip D. Hart, C. David Stinson, McAfee & Taft, P.C., Oklahoma City, for Appellees.

Mark D. Christiansen, Crowe & Dunlevy, P.C., Oklahoma City, and Rand Phipps, Chairman of Legal Committee, Oklahoma Division of Mid–Continent Oil & Gas Association, Oklahoma City, for Amicus Curiae.

HARGRAVE, Justice.

■ ¶ 1 We granted certiorari to review the question whether the implied covenant to market under the oil and gas lease extends to an overriding royalty interest owner. The overriding royalty interest in this case was an in-kind interest granted by separate conveyance rather than reserved in the assignment of oil and gas leases. Specifically, the question is whether the defendants/appellants (hereinafter "SMR") improperly deducted from the overriding royalties paid to plaintiffs their proportionate share of the costs incurred in gathering, processing and compressing gas produced from the subject wells. The trial judge determined as a matter of law that the gas was not in marketable form at the wellhead, and that SMR had a duty to make the gas marketable. The trial judge granted summary judgment for the overriding royalty interest owners. We hold that there is no implied covenant to market applicable in this case because no obligation was undertaken in the instrument creating the overriding royalty interest and because the interest was an in-kind interest deliverable at the wellhead.

## FACTS

¶ 2 The plaintiffs are the successors in interest to an overriding royalty interest conveyed by SMR's predecessor in title. The conveyance was a grant of overriding royalty interest executed in 1967, which provided:

"Whereas, it is the present intent of J.C. Barnes Oil Company to assign, transfer, set over and deliver unto Clayton E. Lee and R.L. Beasley, in equal shares, hereinafter called Assignees, the overriding royalty interest in and to the leases described on Exhibits ... hereto attached in accordance with the terms and conditions thereof ...

"An overriding royalty interest of an undivided ⅛ of ⅞ of all gas, gas condensate or other gaseous hydrocarbons which may be produced under the terms of the oil and gas leases described in Exhibits "A" and "B" attached hereto and made a part hereof, the same to be delivered to the Assignees herein, free and clear of all costs and expenses whatsoever, save and except gross production taxes or other governmental taxes properly chargeable thereto."

¶ 3 The parties agree that this clause created an in-kind overriding royalty interest, meaning that the overriding royalty granted was a fraction of the gas produced rather than of the gas sold. The assignment stated that it applied to all extensions or renewals of the oil and gas leases, and contained a proportionate reduction clause. The overriding royalty interests were made subject to previously existing overriding royalty interests and a production payment. The assignment contained no express provision placing a duty on the lessee to market the product.

¶ 4 Plaintiffs did not take their share of gas in-kind, but instead authorized SMR Property Management Company to market

their share. SMR, acting as agent for itself and the other defendants, paid plaintiffs for gas produced and sold from the leased premises. SMR deducted from the amounts paid to the plaintiffs a charge for gathering and delivering the gas to an amine treatment facility where large quantities of hydrogen sulfide and carbon monoxide were removed from it. The gas was sold at the outlet from the amine treatment facility. Plaintiffs' brief states that the amine treatment facilities are located "on or near" the subject leases.

¶5 Plaintiffs sued to recover all deductions made by SMR for the gathering, delivery and treatment charges, alleging that they were entitled to be paid their overriding royalty interests on gas produced from the subject wells without any deductions for gathering, delivery and treatment of the gas. Plaintiffs sought summary judgment that as a matter of law they were entitled to receive their overriding royalty interest free and clear of any such costs or charges, arguing that the "production" process does not end until a marketable product has been obtained, and that because the gas was not marketable in its natural state, the lessee was required to bear the costs of making it marketable. They relied upon three lessor royalty cases: *TXO v. Commissioners of the Land Office*, 903 P.2d 259 (Okla.1994); *Wood v. TXO*, 854 P.2d 880 (Okla.1992) and *Clark v. Slick Oil Co.*, 88 Okla. 55, 211 P. 496 *(1922)*. Plaintiffs urge us to adopt the rationale of *Garman v. Conoco*, 886 P.2d 652 (Colo.1994), which applied the implied covenant to market under the oil and gas lease to the overriding royalty interests.

¶6 Additionally, plaintiffs argue that the specific language of the assignment means that their interests were to be free and clear of all costs except taxes. Plaintiffs attached an affidavit from an agent of the original assignor stating that the assignor's intent was that the overriding royalty was to be free and clear of all costs of production, including any and all costs of treating the gas to meet pipeline specifications for the purchase or transportation of natural gas, and that the only costs the overrides were to bear were the taxes specified in the assignment. The defendants argue that the plaintiff's roy-

alty is deliverable in kind, so that any language about costs can refer only to costs of exploration and production.

¶7 SMR also moved for summary judgment, arguing that plaintiffs' overriding royalty interest provided for delivery of the plaintiffs' overriding royalty interest in kind, which under Oklahoma law means that the gas is deliverable to plaintiffs at the wellhead and that the plaintiffs are responsible for any expenses incurred thereafter, citing *Application of Martin, infra*. Defendants argue that marketability of the gas is not an issue but that, in any event, SMR has sold the gas at the wellhead of each of the wells since December 1, 1995, and has paid plaintiffs the price received by SMR under its gas purchase contract. SMR argues that the implied covenants of the oil and gas lease do not apply to the overriding royalty owners, who are not parties to the oil and gas lease.

¶8 The trial court and the Court of Civil Appeals found non-marketability of the gas to be the primary issue in the case. The plaintiffs maintain that the agreement of the parties is silent as to the point at which the in-kind overriding royalty is to be delivered free of all costs and expenses and as to the required condition of the gas at the point of delivery.

¶9 SMR maintains that the conveyance of an in-kind royalty means that the place of delivery is at the wellhead and that there is no duty to market an in-kind interest. SMR argues that plaintiffs' election to have SMR market their share of the gas, instead of taking delivery in kind, did not change the fact that plaintiffs were required to bear their proportionate share of costs incurred after the gas leaves the wellhead, citing *Application of Martin*, 321 P.2d 659 (Okla. 1957). Thus, they say, plaintiffs were entitled to receive their share free of cost at the wellhead, and any expenses incurred beyond the wellhead were properly deducted. SMR argues that the *Wood v. TXO and TXO v. Commissioners* cases have no bearing in this case because those cases involved lessor royalties and the lessee's marketing covenant under the oil and gas lease.

## IMPLIED COVENANT

¶ 10 We decided the royalty owner cases based on the implied covenant of marketability under the oil and gas lease. The implied covenants in the oil and gas lease ordinarily can not be enforced by an overriding royalty interest owner. *See,* 3 Summers, *The Law of Oil and Gas,* § 554 (Perm. ed. Supp.1997). Williams and Meyers, *Oil and Gas Law,* § 420, p. 356–7 (1981) states the general rule:

"The owner of an overriding royalty is not entitled to the benefit of the covenants of the base lease, express or implied, in the absence of an express provision in the instrument creating the overriding royalty. The benefits of such express and implied covenants of the lease touch and concern the lessor's estate and burdens of such covenants touch and concern the lessee's estate. The assignment, either in whole or in part, of the burdened estate will not permit enforcement of the covenants which burden the assigned estate by a person other than the lessor or claimants though him of a portion or all of the benefitted estate."

¶ 11 This Court has said that, unless expressly assumed, implied covenants of an oil and gas leases do not extend to lease assignments with reservation of overriding royalty interest. *Kile v. Amerada Petroleum Corp.,* 118 Okla. 176, 247 P. 681 (1925). We said that unless the contract of assignment imposed rights and obligations on the party the same as that of lessor and lessee, such relationship would not be implied. We declined to apply an implied covenant to protect against drainage in favor of an overriding royalty interest owner. We said that to hold the fundamental provisions in leasing contracts to be implied in the contract of assignment would be to stretch the rule beyond legitimate bounds where there was no express agreement in the contract that could form the basis of relief for the breach of an implied obligation. We said that such owner was limited to the terms of the assignment itself and that where there was no express obligation to drill or produce, no covenant would be implied.

¶ 12 In *Kile* we explained that the covenants implied in an oil and gas lease will not be implied in the transfer of an oil and gas lease with retained overriding royalty interest unless other factors are present that require that covenants be implied in order to achieve the fundamental purpose of the transaction. We pointed out that the grant of an overriding royalty interest by the owner of the lease bears no relationship to a leasing transaction and the covenants usually implied in an oil and gas lease should not be implied.

¶ 13 Likewise, the Supreme Court of Arkansas, in *McNeill v. Peaker,* 253 Ark. 747, 488 S.W.2d 706 (1973) held that covenants to reasonably develop or protect the premises from drainage by offsetting wells were not implied as a matter of law in assignments of oil and gas leases in which the assignor's reservation of an overriding royalty interest constituted the principal consideration for the assignment. *See also, Cedar Creek Oil & Gas Co. v. Archer,* 112 Mont. 477, 117 P.2d 265 (1941).

¶ 14 Professor Kuntz points out that the grant of an overriding royalty by the owner of the lease, as distinguished from an exception or reservation of overriding royalty, bears no resemblance to a leasing or subleasing transaction and that the relation is that of grantor and grantee, with no basis for concluding that the parties contemplated that the grantor would owe the grantee any duties regarding development. Accordingly he says, covenants usually implied in oil and gas leases should not be implied in this instance. E. Kuntz, *The Law of Oil and Gas* § 55.3(3).

¶ 15 Williams and Meyers, *supra,* § 420.1 recognize that there may be instances in which implied covenants should be enforceable by overriding royalty owners and Professor Kuntz states that it is possible for other features of the overriding royalty transaction to provide a basis for implying obligations. For example, where the transferor expressly covenants to develop the lease, then there is sufficient basis to invoke the implied covenants incident to the express covenant. Kuntz goes on to say that:

"In the absence of an express covenant to develop and in the absence of special circumstances which reveal that development is the object of the sale, the covenants implied in oil and gas leases should not be implied in the grant of an overriding royalty interest."

¶ 16 The implied covenant to protect against drainage appears to be the implied covenant most often implied in favor of the overriding royalty. It has been surmised that courts that uphold a covenant to protect against drainage in favor of the overriding royalty do so because drainage is tantamount to conversion. *Continental Potash v. Freeport–McMoran,* 115 N.M. 690, 858 P.2d 66, 82 (1993).

¶ 17 Louisiana and Texas have applied the implied covenant to protect against drainage to protect the assignor of oil and gas leases who reserved an overriding royalty interest.[1] In *Bolton v. Coats,* 533 S.W.2d 914 (TX 1975), the Texas Supreme Court held that unless the assignment provides to the contrary, the assignee of an oil and gas lease impliedly covenants to protect the premises against drainage when the assignor reserves an overriding royalty. It is not stated whether the assignment contained any express covenants. The court stated that Bolton was entitled to the benefit of the implied covenant under his assignments if his allegations of drainage were found to be true and if the protection from drainage would have been afforded by a reasonably prudent operator under the same or similar circumstances, relying upon *Phillips Petroleum Co. v. Taylor,* 115 F.2d 726 (5th Cir.194), reh. den., cert. den. 313 U.S. 565, 61 S.Ct. 941, 85 L.Ed. 1524. See also, *Cook v. El Paso Natural Gas Co.,* 560 F.2d 978 (10th Cir.1977), applying New Mexico law, but appearing to rely on authority concerning successors in interest to the *lessor.* Notably, in *Cook,* the court noted that the lessor in that case had no incentive to bring an action because the lessor owned both the leased premises and the tract on which the draining well was located. Further, the New Mexico Supreme Court in, *Continental Potash v. Freeport–McMoran,* 115 N.M. 690, 858 P.2d 66 (N.M. 1993), a mining case, held that the trial court erred as a matter of law in enforcing implied covenants in favor of overriding royalty owners where such covenants were inconsistent with the provisions of the written agreements. The agreement between the parties was specific and unambiguous that the defendant had the right to exercise exclusive control, discretion and judgment regarding all mining operations.

¶ 18 Some courts have begun to apply the implied covenant to market in favor of the overriding royalty owner.[2] *Garman v. Conoco, Inc.,* 886 P.2d 652 (Colo.1994) applied the implied covenant to market the product to the overriding royalty owners before it, with little discussion of the differences between an overriding royalty and the lessor's royalty. In a footnote the *Garman* court noted that some question exists whether the implied covenants under an oil and gas lease extend to overriding royalty owners, citing § 420 of William and Meyers, above. The court stated, however, that the rationale for application of the covenants to protect the lessor similarly extends to the interest of an overriding royalty owners, citing § 420.1 of William and Meyers, *supra,* and *Bolton v. Coats, supra.*

¶ 19 The *Garman* court, in answer to a question certified by the U.S. district court for the western district of Colorado, recognized that royalty interests were governed by the lease, while overriding royalty interests were governed by separate agreements, but determined that all the "non-operating" interests were to be treated equally. The court stated: "We believe, however, that the relationship between the parties specifically provides for a 'free-ride' on costs incurred to

1. Louisiana apparently makes a distinction between an overriding royalty interest that is reserved in an assignment of oil and gas leases and an overriding royalty interest that is conveyed by separate instrument. *See,* Darden, *A New Look at the Implied Obligations,* 34th Institute on Mineral Law 133, 161 (1987), and *Tidelands Royalty*

"B" Corp. v. Gulf Oil Corp., 804 F.2d 1344 (5th Cir.1986).

2. *See Cole Pet. Co. v. U.S. Gas & Oil Co.,* 121 Tex. 59, 41 S.W.2d 414 *(1931) and discussion in: Condra v. Quinoco Petroleum, Inc.,* 954 S.W.2d 68, 72 (Tex.Ct.App. San Antonio 1997).

establish marketable production." *Garman* at p. 657.

¶ 20 The *Garman* court pointed out the Texas and Louisiana[3] courts' treatment of "non-operating" interests (they must bear their proportionate share of costs incurred after gas is severed at the wellhead.) *vis a vis* the Oklahoma and Kansas rules based upon an operator's implied duty to market gas produced under an oil and gas lease. The court noted that Arkansas and North Dakota reached results in line with the Oklahoma and Kansas view when the lease royalty clauses were silent as to allocation of post-production costs.

¶ 21 The *Garman* court rejected Conoco's contention that the implied covenant to market exists separately from the allocation of marketing costs, stating: "In our view the implied covenant to market obligates the lessee to incur those post-production costs necessary to place gas in a condition acceptable for market. Overriding royalty interest owners are not obligated to share in these costs." *Garman* at p. 659. The court's rationale distinguished the non cost-bearing interests from the working interests, using the rationale of *Wood v. TXO, supra*, that the non-working interests have no input into proposed expenditures or course of conduct selected by the operator. The court specifically stated that it was not imposing an additional duty on the lessee, nor expanding the duty previously recognized. Their answer to the certified question was limited to those post-production costs required to transform raw gas into a marketable product.

¶ 22 We must disagree with our sister state's rationale as applied to the overriding royalty interest in this case.[4] Oklahoma has viewed implied covenants differently. Implied covenants to develop an oil and gas lease grew out of the operations of oil and gas leases where production is for mutual benefit of both lessor and lessee. *Central States Production Corp. v. Jordan*, 184 Okla. 262, 86 P.2d 790, 792 (1939). We made clear in *Kile v. Amerada Petroleum Corp., supra*,

that the implied covenants of the oil and gas lease could not be enforced by the overriding royalty owner.

■ ¶ 23 We discussed the nature of the overriding royalty interest extensively in *Thornburgh v. Cole*, 201 Okla. 609, 207 P.2d 1096, 1098 (1949), a coal mining case. We used the definition of "overriding royalty" from a California oil and gas case defining "overriding royalty" as a fractional interests in the production of oil and gas as are created from the lessee's estate, whether by reservation or by grant. We said that the definition applied equally to a coal mining lease, and illustrated the fact that such an interest "overrides" or is in addition to the royalty reserved to the land owner or lessor, and generally arises through contracts between the lessee and a third person, whereby the owner and holder of the ⅞ths working interest provided to the lessee, contracts and agrees that some specified portion of his interest in production shall be paid to a third party, for such consideration as is agreed upon. The lessor, or party receiving the usual royalty provided for in the lease contract, having generally no interest in the working interest, is not a party to such contracts. We said that overriding royalty has been defined as:

> ". . . a certain percentage of the working interest which as between the lessee and the assignee is not charged with the cost of development or production. (citations omitted)."

Professor Kuntz posits that the word "overriding" as a further descriptive term to modify "royalty," is intended to mean that the interest is to override or be free of the burdens normally incident to the working interest out of which it is carved. Kuntz, § 63.2, p. 218. An overriding royalty is an interest in the oil and gas lease out of which it is carved, and cannot be a property interest of greater dignity than the lease itself. *Connell v. Kanwa Oil, Inc.*, 161 Kan. 649, 170 P.2d 631 (Kan.1946).

---

3. See also, *Schroeder v. Terra Energy, Ltd.*, 223 Mich.App. 176, 565 N.W.2d 887 (1997).

4. Although we followed the reasoning of the *Garman* case in *Mittelstaedt v. Santa Fe Minerals, Inc.*, 1998 OK 7, 954 P.2d 1203, we were there dealing with the lessor's royalty interest.

¶ 24 The overriding royalty interest is created out of the working interest in a lease. The assignee of an oil and gas lease may agree to pay the assignor a certain fraction of the assignee's share of the production. *Summers on Oil and Gas § 554, p. 616.* The nature of an overriding royalty interest is such that it attaches only when oil and gas are reduced to possession. Before this, the owner of an overriding royalty has no assertable right in the leasehold and the vesting of such owner's rights are dependent upon the happening of a future event or condition. *DeMik v. Cargill,* 1971 OK 61, 485 P.2d 229. In *DeMik* we held that an overriding royalty was lost upon renewal of the oil and gas lease because, absent fraud or breach of a fiduciary relationship, the interest did not continue and attach to subsequent leases secured in good faith by the lessee.

¶ 25 The rationale of *Kile v. Amerada Petroleum Corp., supra* still applies. Oklahoma has recognized that the overriding royalty interest is different from the lessor's royalty interest. An overriding royalty "overrides," or is in addition to the royalty reserved to landowner or lessor, and generally arises through contracts between the lessee and a third person. *Kile v. Amerada Prod. Corp.* has not been overruled and we decline to do so now. We find that the implied covenant to market cannot be enforced by the overriding royalty interest owners in this case.

### IN–KIND OVERRIDING ROYALTY INTEREST

¶ 26 The overriding royalty interest in the case at bar is an in-kind interest, which makes the point of delivery at the wellhead. *Application of Martin,* 1956 OK 140, 321 P.2d 659 (Okla.1956). We decided the royalty owner cases based upon the implied covenant to market of the oil and gas leases. There is no duty either express or implied on the lessee in the case at bar to do other than deliver the gas to the overriding royalty owners in kind. The overriding royalty owners' decision not to take the gas in kind does not impose different duties on the lessee.

¶ 27 In *Application of Martin,* 1956 OK 140, 321 P.2d 659 (Okla.1956), we held that in the absence of an agreement otherwise an overriding royalty in gas deliverable in kind is to be measured and becomes the property of the overriding royalty owners at the mouth of the well. The overriding royalty language in *Martin* is almost identical to the language in the assignment in the present case. The reservation of overriding royalty in *Martin* specifically provided for the right to deliver the overrides share of said products to the pipeline, and gave the overrides the right to receive their share in kind.

¶ 28 We said that no attempt was made to show that the overriding royalty interest's share of the gross natural production of the unit wells could not be computed from the volume of production as measured at the wellheads and paid on the basis of the market value at that point. Nor was there any showing that said gas then in its raw and natural state was valueless or that there was no market therefor.

We said:

"... appellees' rights and obligations extend no further than receiving, free of cost ... their share of the value of the casing-head gas, as aforesaid, and that the character of the products to which their share applies has not been shown to be necessarily affected by the Plan of Unitization. Being entitled to no more than a share of this raw or natural production they are entitled to none of the hydrocarbons or other products made, manufactured or processed therefrom. Similarly, they are not obligated to pay any of the cost of deriving such commodities from such production without assent."

Later in the opinion we stated:

"We also hold that appellees are not entitled to any share of the hydrocarbons' proceeds, as such. However if convenience or other consideration dictates paying them for their share of the casing head gas by paying them a portion of such proceeds, then such payment should not be made without a deduction of a reasonable charge for processing ... but their net receipts, in no event, should be less than their proportionate share of the market

value of the unit's gross casinghead gas production."

¶ 29 Professor Kuntz, The Law of Oil and Gas § 63.2, has discussed the in-kind overriding royalty interest and we find the comments persuasive:

"In the instance where oil and/or gas is to be delivered in kind, the owner of the overriding royalty is entitled to have the specified share delivered to such owner or to the pipeline free of all costs including costs of secondary recovery operations. The lessee is not, however, required to store oil, and if storage tanks are constructed, the overriding royalty must bear its share of the costs of construction. The lessee is to account for production or its proceeds if sold at the mouth of the well. If any costs are incurred beyond that point, they should be shared. *It follows that, if overriding royalty oil and/or gas is to be delivered in kind, the owner of that interest may make arrangements for sale of the oil or gas or join in any gas purchase contract made by the lessee.*" (emphasis added)

"Ordinarily, the overriding royalty is free of costs incident to development, production and operation. It has been held that compression costs required to market the gas are post-production costs and, accordingly are deductible in paying the overriding royalty. In the absence of an agreement to the contrary, the overriding royalty bears its share of production and severance taxes ..."

¶ 30 In a section discussing royalty on substances other than hydrocarbons, Professor Kuntz says:

"If the oil or gas which is produced is inferior in quality or requires processing before it is marketable because of the presence of some other substance, the theoretical effect of the presence of such substance on the royalty to be paid will depend upon the type of royalty clause involved. *If the royalty clause provides for a delivery of production in kind,* then the duty of the lessee is discharged by a delivery of the oil, gas, casinghead gas or distillate in its raw or unrefined form."

Kuntz, § 41.3(c) p. 379. (emphasis added).

¶ 31 Because the overriding royalty interest in the case at bar is an in-kind interest deliverable at the wellhead, the costs thereafter were properly deducted before the royalty was paid.

## CONCLUSION

¶ 32 Our statements in the royalty owner cases that production has not ended until a marketable product had been obtained, and the references therein to "non-operating interests," were made within the context of the lessor/lessee relationship and the lessee's implied duty, under the oil and gas lease, to market the product. That rationale does not apply in the case at bar. The Assignment whereby the royalty owners received their interests did not create any obligation to market. We find that the trial court erred determining that un-marketability of the gas at the wellhead entitled plaintiffs to summary judgment. The duty placed upon the lessee to deliver gas in marketable form arises from the lessee's implied duty, arising out of the oil and gas lease, to market the product. No such duty exists toward the overriding royalty interest owner unless such obligation is created by the assignment. Here, the obligation is merely to deliver the gas in-kind when production is obtained. *Application of Martin, supra,* and *Kile v. Amerada Petroleum Corp., supra,* are controlling in this case.

**CERTIORARI PREVIOUSLY GRANTED; COURT OF CIVIL APPEALS' OPINION VACATED; TRIAL COURT'S JUDGMENT REVERSED.**

¶ 33 KAUGER, C.J., and HODGES, LAVENDER, SIMMS, OPALA, ALMA WILSON and WATT, JJ., concur.

¶ 34 SUMMERS, V.C.J., concurs in part,dissents in part.

SUMMERS, Vice Chief Justice,
Concurring in part and dissenting in part.

¶ 1 Although I agree with much of the Court's opinion, I respectfully disagree with its method of determining when an implied covenant is present, and with the Court's

reliance upon *Kile v. Amerada Petroleum Corp.*, 118 Okla. 176, 247 P. 681 (1926).

¶2 The Court's opinion states that an implied covenant arising from an oil and gas lease cannot ordinarily be enforced by the possessor of an overriding royalty interest. I agree. But that is not our case today. Rather, the possessor of the overriding interest is attempting to enforce an implied covenant **arising from the assignment of the override**. In this case overriding interests were assigned to Beasley and Lee pursuant to a written instrument entitled "Assignment of Overriding Royalty Interest." The issue before us is whether any implied covenants arise from this assignment.

¶3 This Court has applied principles of contract jurisprudence to instruments creating royalty interests. See *Briggs v. Waggoner*, 1962 OK 108, 375 P.2d 896, 898–899, where we relied upon contract law in construing oil and gas leases. This view is consistent with our statement in *Bonner v. Oklahoma Rock Corp.*, 1993 OK 131, n. 16, 863 P.2d 1176, 1181, that construction-of-contract rules are used by courts when interpreting other writings.

¶4 In the context of construing a conveyance of a real estate interest in *Bonner*, we said the following:

¶17 Contractual duties may arise from implied covenants. Implied-in-fact and implied-in-law (or constructive) covenants are the two varieties of implied covenants. A covenant implied in fact is raised by inference from words used in the agreement to effect the intention of the parties. A constructive covenant, sought here by the Bonners, arises only when the relation of the parties to each other, the nature of the contract, and the public's interest in the parties' activity vis-a-vis one another dictates duties beyond those expressly imposed by contract. Because, as a matter of public policy, constructive covenants impose duties on contracting parties without

their assent, they are disfavored in law; courts are reluctant to imply them where the obligations sought to be imposed are not expressed in the written text.

*Bonner v. Oklahoma Rock Corp.*, 1993 OK 131 at ¶17, 863 P.2d at 1184–1185, notes omitted. Plaintiffs' arguments, although they are not identified as such by the parties, contend for an implied-in-law (constructive) covenant creating a duty to market the gas, and an implied-in-fact covenant that no post-production costs would be deducted from the overriding interest.

¶5 We have indicated that a basis for judicial recognition of implied-in-law (constructive) covenants is to enforce conduct which amounts to fair and equitable dealing dependent upon the circumstances. *Producers Pipe and Supply Co. v. James*, 1958 OK 255, 332 P.2d 958, 960, quoting, Merrill, *Covenants Implied in Oil and Gas Leases*, § 221, (1940 ed.). Courts impose principles of equity on the agreement by requiring the performance of certain duties by a party thereto, although the agreement creating the relationship is silent on that party's duties at issue.[1] This concept was used in *Rees v. Briscoe*, 1957 OK 174, 315 P.2d 758, where we held that the plaintiff could impose an overriding royalty interest by a constructive trust upon the defendant when the defendant did not develop the leases while obtaining renewals of the leases without the overriding interest. The Court's opinion in *Rees* recognized the holdings of *Kile, supra*, and *Phoenix Oil Co. v. Midcontinent*, 177 Okla. 530, 60 P.2d 1054 (1936), but explained that they did not apply to the circumstances involving the overriding interest in *Rees*. The Court said that several cases where assignments had been given could be distinguished because the assignor received compensation at the time of the assignment. *Id.* 315 P.2d at 763. It also examined the reasonable expectations of the assignor. It explained that with regard to the assignor Rees, "It is un-

1. This concept is similar to a quasi-contractual obligation recognized by a court when applying equitable principles to the particular circumstances before the court. See *Booker v. Sears Roebuck & Co.*, 1989 OK 156, n. 2, 785 P.2d 297, 301, (Summers, J., Concurring,), and the explanation that modern law of quasi-contract law is derived from Lord Mansfield's opinion in *Moses v. Mcferlan*, 2 Burr. 1005, 97 Eng.Rep. 676 (1760), and the description that the quasicontractual obligation arises from the "ties of natural justice" and the law recognizes an action "founded in equity."

reasonable to assume that Rees would assign his lease for no present consideration unless he felt that he could depend upon Briscoe to undertake the development of the lease." *Id.*

¶ 6 The Court in *Rees* did not look for an express covenant to drill or develop in the instrument that assigned the interest and retained the override. However, the Court in *Kile* did just that when determining whether an implied covenant existed. *Kile*, 247 P. at 683. *Kile* denied the existence of an implied covenant because of the absence of express covenant on the same issue. But this analysis in *Kile* was characterized by Doctor Merrill as resting upon an untenable ground. He said that in *Kile*, "the existence of an implied covenant between the assignor reserving the overriding royalty and the assignee is squarely denied, **largely upon the untenable ground that an implied covenant must rest upon an express obligation to drill.**" M. Merrill, *Covenants Implied in Oil and Gas Leases*, 417 (2d ed.1940), emphasis added.

¶ 7 Doctor Merrill is correct in his criticism of *Kile*. Implied covenants are not created by the presence of an express covenant. Rather, an implied covenant can only exist in the absence of an express covenant. See *Jones v. University of Central Oklahoma*, 1995 OK 138, 910 P.2d 987. There we said that "a contract covering the identical subject cannot be implied, because an implied agreement cannot coexist with the express contract." *Id.* 1995 OK 138 at ¶ 11, 910 P.2d at 990. Simply, an implied covenant to market does not arise because of an express promise to market is found in the lease, agreement, or contract. *Kile's* rationale to the contrary is truly untenable.

¶ 8 The Court relies upon Professor Kuntz for the proposition that an overriding royalty interest does not include implied covenants. But the author goes on to make distinctions based upon which implied covenant is being discussed and how the override is created. For example, he states that: "If the retained overriding royalty is the sole consideration for the transfer, covenants might be implied on the theory that the fundamental purpose of the transaction was not a simple sale but development and prop-

er operation of the premises." 5 E. Kuntz, *A Treatise on the Law of Oil and Gas*, § 55.3(e) (1991). Thus, both *Rees* and Professor Kuntz recognize that the purpose of the transaction is examined **even if it is an assignment of an overriding interest** to determine what, if any, implied covenants are created.

¶ 9 Further, as it appears from *Rees*, the reasonable expectation and intent of the parties is used to determine the purpose of the instrument creating the interest. Other courts use a similar analysis, and have held that when construing agreements creating such interests the intent of the parties must be examined. *Moncrief v. Harvey*, 816 P.2d 97, 103 (Wyo.1991). That court also stated that "an assignor who retains an overriding royalty interest is also entitled to the protection afforded by the express or implied covenants of the lease." *Id.* 816 P.2d at 103, citing opinions from Texas. One of these states that: "Where there is no express agreement between the assignor and the assignee, there is an implied covenant on the part of the assignee to protect the premises against drainage when there is an overriding royalty reserved for assignor." *Wes–Tex Land Co. v. Simmons*, 566 S.W.2d 719, 721 (Tex.Civ.App.1978).

¶ 10 It may very well be that when a geologist receives an override for his services his interest should be considered as a type of sale of the override without implied covenants relating to the operations of the lease. However, neither the courts nor authors such as Kuntz or Merrill argue that creation of an override should *ipso facto* exclude the presence of implied covenants. Thus I respectfully dissent from a portion of the Court's opinion.

¶ 11 This matter is before us on an appeal from a summary judgment granted by the trial court. Our review of a summary judgment requires us to determine if there is a genuine issue of material fact, and we view the evidentiary materials in the light most favorable to the non-moving party. *First American Bank v. Industrial Finance Authority*, 1997 OK 155, ¶ 2, 951 P.2d 625, 627. Pursuant to this standard the summary judgment for Plaintiffs must be reversed. An

implied covenant arises, if at all, from the nature of the transaction. Plaintiffs have cited no authority for an implied covenant to market arising *ipso facto* from an agreement creating an overriding royalty interest. But clearly, an implied covenant may arise from an agreement creating an overriding royalty interest. *Rees v. Briscoe, supra.* *Rees* indicates that we must look at the intent of the parties and the nature of the agreement at issue. The record fails to contain undisputed material facts on the intent of the parties to the agreement, or any evidence·on custom and usage involving overriding royalty interests created as compensation to geologists for their work involving leased mineral interests. See *Oxley v. General Atlantic Resources, Inc.,* 1997 OK 46, ¶¶ 14, 18–19, 936 P.2d 943, 942, where we discussed the absence of facts sufficient to support a summary judgment involving custom and usage concerning the intent of the parties to a joint operating agreement. The record is similarly insufficient to support summary judgment for Defendants. Thus I would reverse the summary judgment and remand to the District Court for trial.